ALASKA ELECTRICAL PENSION FUND, On Behalf of Itself and All Others Similarly Situated, Plaintiffs,

v.

ADECCO S.A.; John Bowmer; Jerome Caille; and Felix A. Weber, Defendants.

In re Adecco S.A. Securities Litigation

This Document Relates to: All Actions

No. CIV. 04CV0129L(JFS).

United States District Court, S.D. California.

May 16, 2005.

Jeffrey W. Lawrence, William S. Lerach, Darren Jay Robbins, Lerach, Coughlin, Stoia, Geller, Rudman and Robbins, San Diego, CA, Jeffrey W. Lawrence, Milberg, Weiss, Bershad, Hynes and Lerach, San Francisco, CA, Peter D. Bull, Bull and Lifshitz, Samuel H. Rudman, Cauley, Geller, Boman and Rudman, Melville, NY, Catherine A. Torrell, Cohen, Milstein, Hausfeld and Toll, James E. Tullman, Weiss and Yourman, Arthur N. Abbey, Abbey and Ellis, New York City, Robert S. Gans, Berstein, Litowitz, Berger and Grossmann, San Diego, CA, for Plaintiffs.

Laurie B. Smilan, Latham & Watkins, Reston, VA, Julia A. Parry, Latham & Watkins LLP, San Diego, CA, for Defendants.

## ORDER: (1) GRANTING MOTION TO DISMISS CONSOLIDATED COMPLAINT; (2) DISMISSING CONSOLIDATED COMPLAINT WITHOUT PREJUDICE

LORENZ, District Judge.

On March 14, 2005, this matter came on regularly for a hearing on Defendants' Motion to Dismiss the Consolidated Complaint. Scott H. Saham of Lerach Coughlin Stoia Geller Rudman & Robbins, LLP appeared for Plaintiffs. Laurie B. Smilan of Latham & Watkins appeared for the Defendants. At the conclusion of the hearing, the Court requested the parties to submit supplemental briefing.[1]

Having carefully reviewed the parties' briefs, oral argument, and applicable law, the Court finds the Consolidated Complaint does not meet the pleading requirements under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §§ 78u–4(b)(1) and (2), and therefore **GRANTS** Defendants' motion to dismiss. This dismissal, however, is without prejudice and Plaintiffs have 45 days from the date this order is stamped "Filed" to file an amended complaint.

### BACKGROUND

Plaintiffs filed this action under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78(t)(a), and Rule 10b–5 of the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b–5. Plaintiffs allege violations of the statute and regulation on behalf of a class of investors who purchased Defendant Adecco S.A. ("Adecco" or "the Company") stock between March 16, 2000 to January 9, 2004 (the "Class Period"). (Compl. ¶ 1.) Defendants are Adecco and four of its officers and directors. Defendant John P. Bowmer was Chairman of Adecco from February 2002 through the end of the Class Period and previously was CEO of the Adecco Group since its inception in 1996. *Id.* ¶ 30. Defendant Jerome Caille has been the CEO of Adecco since March 2002, and prior to that served as President of the Adecco Staffing division.

---

1. Plaintiffs argue Defendants' supplemental brief abandons Defendants' arguments in their opening and reply memoranda regarding the particularity of the Complaint's allegations. The Court disagrees. The Court invited the parties to provide supplemental briefs to address issues raised at the hearing. Defendants' supplemental brief accordingly asserts they were "supplement[ing] their papers and their oral argument with this further response to questions posed by the Court." (Defs.' Supplemental Br. at 1.) The Court therefore declines to hold Defendants have waived any arguments asserted in their opening and reply briefs.

*Id.* ¶ 31. Defendant Felix A. Weber was CFO of Adecco from 1998 until 2004. *Id.* ¶ 32. Defendant Klaus J. Jacobs is one of the Company's founders and currently co-Chairman of the Board of Directors of Adecco. *Id.* ¶¶ 33, 135.

Adecco is a Swiss company primarily engaged in providing personnel services to companies and industry worldwide. *Id.* ¶¶ 1, 12, 29. Adecco provides these services by contract to businesses located throughout North America, Europe, Asia Pacific and Latin America. *Id.* ¶¶ 1, 29. The Company's North American ("Adecco North America") operations accounted for approximately 24% of total revenue at Adecco in 2003. *Id.* ¶¶ 18, 29. The Company's stock trades on the SWX Swiss Stock Exchange and is listed on Euronext Premier Marché. *Id.* ¶ 12. Adecco's stock is also traded as American Depositary Shares on the New York Stock Exchange. *Id.*

In March 2000, Adecco acquired Olsten Corporation, a U.S. company, primarily for its more advanced technology. *Id.* ¶¶ 13, 43. Adecco then terminated more than 600 of its most senior and experienced North American executives, regional managers, and district managers in favor of Olsten's less-qualified senior managers and executives. *Id.* ¶ 43. After the Olsten takeover, the Company discovered it would be unable to collect millions of dollars in receivables from Olsten's customers, who had gone bankrupt or who had unresolved billing disputes. *Id.* ¶¶ 42–50. According to Plaintiffs, Adecco should have written off the bad receivables, which totaled at least in the tens, if not hundreds, of millions of dollars. *Id.* ¶ 44. Another problem facing Adecco North America after the takeover was its inability and failure to match customer payments to proper invoices. *Id.* ¶¶ 46, 47. When this occurred, many customers refused to pay new invoices. *Id.* ¶ 47.

The combination of millions of dollars in uncollectible debt and the amount that customers refused to pay resulted in hundreds of millions of dollars of outstanding receivables on Adecco's books during 2000 and 2001. *Id.* ¶ 48. In order to conceal the amount of bad debt it acquired in the Olsten merger and inflate the price of Adecco's securities, Defendants misrepresented and omitted material facts in forms filed with the SEC and disseminated in press releases and conference calls. *Id.* ¶¶ 115–17. Plaintiffs maintain Defendants engaged in a variety of accounting shenanigans and failed to properly take allowances for doubtful accounts in its 2000 and 2001 financial statements. *Id.* ¶¶ 115, 119, 121–23. In particular, Adecco North America violated generally accepted accounting principles ("GAAP") by applying new moneys received from customers to old outstanding invoices. *Id.* ¶ 53. Plaintiffs also aver that Adecco North America manipulated its financial statements by billing customers at incorrect rates, improperly classifying its workers, engaging in State Unemployment Tax Act ("SUTA") dumping, and delaying its payments to vendors. *Id.* ¶¶ 40, 59–63, 69–70.

The outstanding and uncollectible receivables remained on Adecco's books until its financial statement for year-end 2002, when Adecco began writing off the receivables that had been on its books for more than 90 days. *Id.* ¶ 50. Prior to that time, some receivables had remained on Adecco's books more for two years. *Id.*

Adecco switched auditors from Arthur Andersen to Ernst & Young, LLP in late 2002. *Id.* ¶ 57. In early 2003, Ernst & Young warned Defendants they needed to correct the misallocation of current cash receipts by year-end 2003. *Id.* ¶¶ 36, 57. However, Defendants continued to engage in this practice until it learned Ernst & Young would not allow the lead auditor

Mike Sills to sign off on the accounting scheme. *Id.*

On January 12, 2004, Adecco issued a press released entitled "Adecco S.A. Delays Announcement of FY 2003 Audited Results." *Id.* ¶¶ 3, 107. The press release stated in part:

> Adecco S.A. announced that it does not expect the audit of its consolidated financial statements for the 2003 fiscal year, ended on December 28, 2003, to be completed by Adecco's auditors, by the previously announced release date of February 4, 2004.
>
> The reasons of the delay in completion of the audit include:
> — The identification of material weaknesses in internal controls in the Company's North American operations of Adecco Staffing
> — The resolution of possible accounting, control and compliance issues in the Company's operations in certain countries
> — The completion of the Company's efforts to address these matters and determine their effect on the Company's consolidated financial statements.
> In this regard an independent Counsel has been appointed by the Audit & Finance Committee of the Company's Board of Directors to conduct an investigation.
> The Company is not yet able to predict when the 2003 audit of its consolidated financial statements will be completed.

*Id.* Following this news, Adecco's stock dropped from almost $17 per share to as low as $10 per share. *Id.* ¶ 4. The SWX Swiss Stock Exchange, SEC, and United States Department of Justice initiated investigations into possible violations of the law. *Id.* ¶¶ 5, 15, 109, 111.

Several plaintiffs filed securities fraud class actions against Adecco shortly after the January 12 announcement, contending the Company would have to restate its FY 2000–2003 results to eliminate millions in improperly-recorded revenues. The cases were filed in this district and in the Southern District of New York. The New York cases were transferred to this district, and all actions consolidated.

On June 1, 2004, Adecco released its 2003 Annual Report. (*Id.* ¶ 114; Parry Decl. Ex. H.) Adecco announced in this report that its "accounts were signed by [the] auditors with no qualification, no restatement of prior year results and with no evidence of material irregularities." (Parry Decl. Ex. H at 599.) Plaintiffs allege that Adecco's 2003 Annual Report conceded that problems in controls had existed and that it had not just been overcautiousness on the part of the Board or the Company's outside officers. (Compl. ¶ 114.) Defendant Bowmer hoped that the "unfortunate episode" was ending, and stated that Adecco had "taken a number of significant steps to reinforce our audit and control functions throughout the Company." *Id.* In the report, Defendant Caille stated that Adecco had "used this opportunity to review [its] operations and systems in the U.S. and drive process efficiencies as well as strengthen[ ] . . . internal controls." *Id.*

On September 13, 2004, Plaintiffs filed the instant Consolidated Complaint. All Defendants except Defendant Jacobs, who had not yet been served with the Complaint, filed a motion to dismiss.

## APPLICABLE LAW REGARDING MOTIONS TO DISMISS SECURITIES CLASS ACTIONS

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint. *Navarro v. Block,* 250 F.3d 729, 732 (9th Cir.2001). Dismissal of a claim under this rule is appropriate only where "it appears beyond doubt that

the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Navarro,* 250 F.3d at 732. In reviewing a motion to dismiss under Rule 12(b)(6), the court must assume the truth of all factual allegations and must construe them in the light most favorable to the nonmoving party. *Thompson v. Davis,* 295 F.3d 890, 895 (9th Cir.2002), *cert. denied,* 538 U.S. 921, 123 S.Ct. 1570, 155 L.Ed.2d 311 (2003); *Cahill v. Liberty Mut. Ins. Co.,* 80 F.3d 336, 337–38 (9th Cir.1996). However, legal conclusions need not be taken as true merely because they are cast in the form of factual allegations. *Roberts v. Corrothers,* 812 F.2d 1173, 1177 (9th Cir.1987); *Western Mining Council v. Watt,* 643 F.2d 618, 624 (9th Cir.1981).

■ Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful to use in connection with the mails or facilities of interstate commerce any "manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commissioner may prescribe." 15 U.S.C. § 78j. SEC Rule 10b–5, promulgated under section 10(b), provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. The elements of a Rule 10b–5 claim are: (1) a misrepresentation or omission of a material fact; (2) scienter; (3) causation; (4) reliance; and (5) damages. *In re Daou Systems, Inc. Sec. Litig.,* 397 F.3d 704, 710 (9th Cir. 2005).

■ Claims brought under Rule 10b–5 and § 10(b) must meet Federal Rule of Civil Procedure 9(b)'s particularity requirement that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b); *see Daou,* 397 F.3d at 710; *Yourish v. Cal. Amplifier,* 191 F.3d 983, 993 (9th Cir.1999). In addition, in 1995, Congress enacted the PSLRA and altered the pleading requirements in private securities fraud litigation by requiring a complaint " 'plead with particularity both falsity and scienter.' " *Daou,* 397 F.3d at 710 (quoting *Gompper v. VISX, Inc.,* 298 F.3d 893, 895 (9th Cir. 2002)). As interpreted by the Ninth Circuit, a complaint alleging securities fraud "must now 'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.' " *Id.* (quoting *Gompper,* 298 F.3d at 895).

### SUFFICIENCY OF THE ALLEGATIONS OF VIOLATIONS OF § 10(B) AND RULE 10B–5

### I. *Sources of Plaintiffs' Information*

■ In the Ninth Circuit, a securities fraud complaint has to "state with particularity all facts on which [a] belief is formed," and in so doing, the plaintiff must reveal "the sources of her information." *In*

*re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970, 985 (9th Cir.1999) (citation and internal quotation marks omitted); *accord Daou,* 397 F.3d at 711–12. In opposition to Defendants' motion and at oral argument, Plaintiffs indicated their allegations were based on information obtained from confidential witnesses. The Ninth Circuit recently addressed the use of confidential witnesses' accounts in satisfying the PSLRA's standard of particularity. *See Daou,* 397 F.3d at 711–12; *Nursing Home Pension Fund, Local 144 v. Oracle Corp.,* 380 F.3d 1226 (9th Cir.2004).

In *Nursing Home,* the appellate court applied the Second Circuit's standard that "personal sources of information relied upon in a complaint should be 'described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'" *Nursing Home,* 380 F.3d at 1233 (quoting *Novak v. Kasaks,* 216 F.3d 300, 314 (2d Cir. 2000)). Earlier this year the Ninth Circuit in *Daou* held that the Second Circuit's standard is augmented by the First Circuit's suggested criteria for assessing reliability of witnesses, which "'involves an evaluation, *inter alia,* of the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia.'" *Daou,* 397 F.3d at 711–12 (quoting *In re Cabletron Sys., Inc.,* 311 F.3d 11, 29–30 (1st Cir.2002)). The Ninth Circuit found the complaint in *Daou* met the PSLRA's requirement for confidential witnesses because those witnesses were described with great specificity: plaintiffs numbered each witness and described his or her job description and responsibilities. *Id.* at 712.

■ The Complaint in this action does not provide any details regarding the con- fidential witnesses upon which its allegations rely. Instead, the only reference to a witness is to "one former executive." (Compl. ¶ 55.) Plaintiffs maintain they are not required to identify their confidential sources of information with any additional specificity. In support, Plaintiffs quote *Daou 's* statement that " '[w]here plaintiffs rely on both confidential witnesses and other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false.'" (Pls.' Supplemental Br. at 2, quoting *Daou,* 397 F.3d at 711.) That statement from *Daou,* however, fails to support Plaintiffs' proposition. The quote discusses *naming* sources; that is, identifying the confidential witness by name, which is a separate issue from describing the confidential witnesses to assess their reliability. *See Daou,* 397 F.3d at 711. Further, *Daou* expressly held that to meet the PSLRA's particularity requirement, a description of confidential witnesses is necessary in addition to corroborating facts: "[n]aming sources is unnecessary so long as the sources are described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged *and* the complaint contains adequate corroborating details." *Id.* at 712 (emphasis added) (internal quotations omitted). Accordingly, the absence of any description of the confidential witnesses upon which the Complaint relies requires dismissal.

## II. *Allegations Regarding False and Misleading Statements*

Plaintiffs allege the Company's representations regarding its financial condition that were disseminated through press releases, conference calls, and SEC filings during the Class Period were false and misleading because the information report-

ed was not prepared in conformity with GAAP, nor was the financial information a "fair representation" of the Company's operations due to Adecco North America's improper accounting practices. (Compl. ¶¶ 115–17.) The gravamen of the Complaint is that the Company did not reveal the extent of Adecco North America's uncollectible receivables and unapplied payments, and that Adecco North America improperly applied new cash receipts to old outstanding invoices to conceal the uncollectible receivables and unapplied payments from investors. Plaintiffs also allege the Company's financial statements were false and misleading because Adecco North America: (1) billed customers at incorrect rates; (2) improperly classified workers; (3) engaged in SUTA dumping; and (4) delayed payment of vendor invoices. Defendants argue these allegations do not meet the PSLRA's particularity requirement.

### A. Applicable Law Regarding Accounting Fraud Allegations

Because Plaintiffs maintain Adecco's financial disclosures were false and misleading due to accounting improprieties, the standard for pleading accounting fraud must be addressed. "To properly state a claim for accounting fraud, plaintiffs must plead facts sufficient to support a conclusion that [d]efendant[ ] prepared the fraudulent financial statements and that the alleged financial fraud was material." *Daou*, 397 F.3d at 712 (alterations in original) (internal quotations omitted). GAAP violations can provide evidence of scienter. *Id.* However, "the complaint must describe the violations with sufficient particularity; a general allegation that the practices at issue resulted in a false report of company earnings is not a sufficiently particular claim of misrepresentation." *Id.* at 712–13 (internal quotations omitted).

"When pleading irregularities in revenue recognition, plaintiffs should allege: (1) such basic details as the approximate amount by which revenues and earnings were overstated; (2) the products involved in the contingent transaction; (3) the dates of any of the transactions; or (4) the identities of any of the customers or [company] employees involved in the transaction." *Id.* at 713 (alteration in original) (internal quotations omitted). Although Plaintiffs need not allege each of those particular details, they must allege enough to allow a court to "'discern whether the alleged GAAP violations were minor or technical in nature, or whether they constituted widespread and significant inflation of revenue.'" *Id.* (quoting *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F.Supp.2d 1248, 1273 (N.D.Cal. 2000)). Thus, to support a claim of fraud, a plaintiff must plead with particularity how the accounting manipulations "affected the company's financial statements and whether they were material in light of the company's overall financial position." *Id.* at 714.

### B. Allegations Regarding Uncollectible Receivables and Application of Current Cash Receipts to Old Accounts Receivable

Plaintiffs contend Adecco's financial woes began as a result of its takeover of Olsten in 2000. (Compl. ¶¶ 13, 42.) According to Plaintiffs, after the acquisition, the Company discovered it would be unable to collect tens, if not hundreds of millions in receivables from Olsten's customers who had gone bankrupt or who had unresolved billing disputes. *Id.* ¶¶ 42–44. Adecco North America's operations did not have an automatic system in place to match payments to the proper invoice and as a result, payments were often manually credited to the wrong invoice. *Id.* ¶ 47. When this happened, many customers con-

tended they had already paid the outstanding amount and refused to pay the new invoice until Adecco North America determined the correct outstanding amount. *Id.* This issue compounded Adecco North America's problems with uncollectible receivables. *Id.* Plaintiffs also allege that as of May 2001, the aggregate "unapplied payments" figure was in the tens of millions of dollars, and estimated to be about $40 million by a former executive. *Id.* ¶ 55.

The Complaint alleges the Company's financial statements for 2000 and 2001 were false and misleading because they failed to properly take allowances for Adecco North America's doubtful accounts. *Id.* ¶¶ 2, 119. According to Plaintiffs, in an effort to address the massive uncollectible receivables without having to write them off, accountants in the Cash Application division of the Corporate Accounts Receivable Department in Melville, New York violated GAAP by improperly applying new cash receipts, which were intended to satisfy recent customer invoices, to the same customers' old outstanding receivables. *Id.* ¶¶ 53, 121. By manipulating the aging of its receivables, the Company understated its bad debt expenses. *Id.* ¶¶ 54, 121.

Understatements of bad debt reserves can support a securities fraud claim because "[c]ompanies are obliged to make reasonable predictions about the collectability of their accounts receivable. Underestimates of bad debt reserves lead to overstatement of income, and ultimately inflation of stock price." *Kane v. Madge Networks N.V.,* No. C–96–20652–RMW, 2000 WL 33208116, at *5 (N.D.Cal. May 26, 2000). However, allegations that bad debt reserves are inadequate are insufficient; "plaintiffs must allege with particularity facts that show the initial prediction was 'a falsehood.' " *Id.* (quoting *In re GlenFed, Inc. Sec. Litig.,* 42 F.3d 1541,

1549 (9th Cir.1994) (en banc)). "[E]ven a delinquent write-down of the impaired assets, without anything more, does not state a claim of securities fraud, stating at best a bad business decision." *In re ICN Pharms., Inc. Sec. Litig.,* 299 F.Supp.2d 1055, 1065 (C.D.Cal.2004). To meet the PSLRA's pleading standard, Plaintiffs must allege facts demonstrating that the decision not to write off the bad receivables in 2000 and 2001 was " 'such that no reasonable accountant would have made the same decision if confronted with the same facts.' " *In re MCI Worldcom, Inc. Sec. Litig.,* 191 F.Supp.2d 778, 790 (S.D.Miss.2002) (quoting *In re Miller Indus., Inc.,* 120 F.Supp.2d 1371, 1382 (N.D.Ga.2000)). The Complaint fails to meet this particularity requirement.

Absent from the Complaint are any factual allegations that Defendants knew when preparing the Company's 2000 and 2001 financial statements that certain accounts at Adecco North America were uncollectible and should have been written off during that time frame. To the contrary, the Complaint suggests Adecco North America intended to collect the outstanding receivables, alleging that after the Olsten acquisition, "Adecco North American corporate offices instructed every branch to begin making efforts to collect the outstanding receivables." (Compl. ¶ 45.) There are no allegations explaining why the allegedly uncollectible receivables were outside of the range provided for by the Company's allowance for doubtful accounts, and by how much. As such, the Complaint does not properly state an accounting fraud claim based on the Company's allowance for bad receivables and its failure to write off its uncollectible receivables before its year-end 2002 financials. *Cf. Kane,* 2000 WL 33208116, at *5–6 (finding accounting fraud allegations insufficient because plaintiffs did not allege particular facts showing that defendant's

accounts receivables reserves were understated); *In re Loewen Group Inc.*, No. Civ.A. 98–6740, 2003 WL 22436233, at *11 (E.D.Pa. July 16, 2003) (holding that allegations of inflated valuation of assets insufficient because plaintiffs did not plead, *inter alia*, "the time and amount by which any asset should have been written down, who knew the assets were overvalued or what information was available to defendants that should have alerted them to the need for a write-down."); *MCI Worldcom*, 191 F.Supp.2d at 789–90 (holding that PSLRA not satisfied through allegations that company delayed write off of uncollectible receivables because there was no showing that no reasonable accountant would have deferred write-off).

The absence of factual allegations supporting Plaintiffs' claim Adecco North America had tens, if not hundreds of thousands, of uncollectible receivables that should have been written off in its 2000 and 2001 financial statements undermines Plaintiffs' claim that Defendants engaged in accounting improprieties to avoid disclosing and writing off those receivables. In addition, the Complaint's allegations regarding improper application of new cash receipts to old outstanding invoices lack particularity. Plaintiffs are correct that they do not have to allege every individual improper transaction. *See Daou*, 397 F.3d at 713. However, a complaint must allege

enough information to allow the court to discern whether the alleged GAAP violations "affected the company's financial statements and whether they were material in light of the company's overall financial position."[2] *Id.* at 714. This the Complaint fails to do.

Plaintiffs aver that Adecco North America's bad receivables totaled in the "tens, if not hundreds of millions of dollars," and that its "unapplied payments" was $40 million dollars. (Compl.¶¶ 44, 55) The Complaint also asserts that the improper matching "occurred with payments received from the majority of Adecco's North American customers," and consequently had a huge impact on the Company. *Id.* ¶ 47. However, these assertions are not corroborated with any examples. Also missing from the Complaint are factual allegations regarding the amount of Adecco North America's revenue inflation and quantifying the impact of Adecco North America's financials on Adecco's consolidated financial statements for its worldwide operations. Thus, the Complaint's allegations currently do not allow a court to "'discern whether the alleged GAAP violations were minor or technical in nature, or whether they constituted widespread and significant inflation of revenue.'" *Daou*, 397 F.3d at 713 (quoting *McKesson*, 126 F.Supp.2d at 1273).

---

2. Plaintiffs argue that materiality is not properly considered on a motion to dismiss, but rather must await summary judgment or trial. Plaintiffs also cite cases finding that information regarding a company's finances is material. The authority Plaintiffs cite are inapposite, as they all concerned the materiality of the information disseminated to the shareholders and public. *See Cox v. Aurora Elecs.*, No. CV 93–3292 DT (JG), 1993 WL 652792, at *4–5 (C.D.Cal. Oct. 18, 1993); *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 166 (2d Cir. 2000); *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 317 (3d Cir.1997); *In re Burlington Coat*

*Factory Sec. Litig.*, 114 F.3d 1410, 1421 (3d Cir.1997); *McNamara v. Bre–X Minerals Ltd.*, 197 F.Supp.2d 622, 685 (E.D.Tex.2001). That is, the issue presented in those cases was whether the defendants' statements or omissions would have affected an investor's decision to purchase or sell the company's stock. In contrast, the materiality element referenced by Defendants and discussed in *Daou* does not bear upon the information presented to the public; rather, it requires plaintiffs to show that accounting fraud was material to the company's overall financial condition.

## C. Allegations Regarding Other Accounting Improprieties

■ The Complaint's remaining accounting fraud allegations also do not meet the PSLRA's pleading requirements. First, Plaintiffs aver that Adecco's National Accounts group in Melville, New York negotiated agreements with designated national account customers who insisted on establishing flat billing rates lower than billing rates with customers that were set on a placement-by-placement basis. (Compl. ¶¶ 59, 123.) Adecco established special "national account" codes that were supposed to be used at the branch level nationwide to ensure the contractual pricing was applied on all placements with that customer. *Id.* However, the branches did not always input placements into the computer system using the national account code for these customers, and instead negotiated higher billing rates with the specific customer representative with whom they were dealing. *Id.* According to Plaintiffs, the improper recognition of revenue further added to the Company's overstatement of its receivables and failure to timely record bad debt as many customers would refuse to pay the higher than agreed-upon rate when billed. *Id.* ¶¶ 59, 122–24.

Plaintiffs also allege that during the Class Period, Adecco North America employment candidate positions were improperly classified or coded for workers' compensation purposes as lower level positions than they actually were. *Id.* ¶¶ 60, 62. This practice lowered the workers' compensation payments the Company had to make to state authorities and thereby allowed Adecco to improve its reported gross margins, which in turn increased managers' bonuses. *Id.* Workers' compensation codes for a staffed employee were also changed to reduce the FICA costs and thereby increase the Company's profit margin. *Id.* ¶ 62.

Plaintiffs next maintain Adecco North America intentionally changed employment candidates' marital status and number of dependents when providing candidate information to its customers. *Id.* ¶ 63. This practice made the customers believe that the Company had to pay higher insurance rates for these employees and thereby justified to customers increasing the employees' hourly billing rates. *Id.*

Plaintiffs also allege that the SEC is investigating whether Adecco North America engaged in SUTA dumping to illegally misrepresent its financial statements by fraudulently avoiding its full state unemployment tax burden. *Id.* ¶ 40.

The last accounting impropriety alleged concerns vendor invoices for typical costs such as utilities and phone bills. *Id.* ¶ 69. Vendor invoices were sent directly to each branch, and the bills were mailed once a week to Adecco's North American corporate Accounts Payable department for payment. *Id.* Plaintiffs contend that if one of the branches was having a bad month financially, the branch would wait until the following month to send it to the corporate Accounts Payable department. *Id.* ¶ 70. The purpose of waiting until the next month was to ensure that the bill would not appear on the current month's P & L statement, which already indicated a bad financial month. *Id.*

None of these purported acts of accounting misconduct is sufficient to support Plaintiff's claim. While the Complaint contains general allegations that the improper practices occurred throughout Adecco North America, there are no facts pleaded regarding what impact they had on Adecco North America's revenues. More importantly, the Complaint is silent as to what impact, if any, these accounting irregularities had on Adecco's consolidated worldwide financial results. Accordingly, the Complaint's allegations currently do

not allow a court to discern whether the accounting manipulations " 'were minor or technical in nature, or whether they constituted widespread and significant inflation of revenue.' " *Daou,* 397 F.3d at 713 (quoting *McKesson,* 126 F.Supp.2d at 1273).

## III. *Scienter Allegations*

The PSLRA requires federal securities complaints to state with particularity facts giving rise to a strong inference the defendants acted with scienter. 15 U.S.C. § 78u–4(b)(2). Scienter is defined as "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The Ninth Circuit has interpreted the PSLRA as requiring plaintiff to "plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *Silicon Graphics,* 183 F.3d at 974. Recklessness satisfies the scienter requirement only insofar as it reflects some degree of conscious or deliberate misconduct; *i.e.,* "a degree of recklessness that strongly suggests actual intent." *Id.* at 979. In determining whether plaintiffs have adequately plead scienter, courts must consider " 'whether the total of plaintiffs' allegations, even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness.' " *No. 84 Employer–Teamster Jt. Council Pension Trust Fund v. Am. W. Holding Corp.,* 320 F.3d 920, 938 (9th Cir.), *cert. denied,* 540 U.S. 966, 124 S.Ct. 433, 157 L.Ed.2d 311 (2003) (quoting *Lipton v. Pathogenesis Corp.,* 284 F.3d 1027, 1038 (9th Cir.2002)). When conducting this analysis, the court must consider all reasonable inferences, whether or not favorable to the plaintiffs. *Gompper,* 298 F.3d at 897.

Plaintiffs maintain they adequately pleaded scienter. They rely on the Com-

plaint's allegations that the individual Defendants were in a position to know and did in fact know the accounting manipulations. Plaintiffs also cite the temporal proximity of the Company's post-class period statements to the alleged misrepresentations regarding Adecco's financial condition. Plaintiffs invoke the group pleading doctrine to support their argument for a strong inference of scienter. Stock sales by a philanthropic organization associated with Defendant Jacobs also form the basis of Plaintiffs' scienter allegations. Finally, Plaintiffs argue Defendants engaged in accounting irregularities because they wanted to conceal a bad management decision to acquire Olsten corporation. These allegations individually and taken as a whole do not give rise to a strong inference of scienter.

## A. Scienter Based on the Individual Defendants' Knowledge of the Accounting Manipulations and on Their Positions in the Company

Plaintiffs argue they have adequately alleged scienter because the Complaint avers the individual Defendants were aware of the accounting manipulations. Plaintiffs also contend that because the fraud occurred systematically throughout Adecco North America and the individual Defendants were the highest-ranking members of Adecco, it must be assumed they knew about the accounting irregularities. Therefore, Plaintiffs maintain, there is a "reasonable inference" Defendants acted with scienter. (Opp'n at 14.) These arguments are unpersuasive.

As an initial matter, a "reasonable inference" of scienter is insufficient to meet the particularity requirement for pleading scienter; rather, the facts alleged must give rise to a strong inference of scienter. *Daou,* 397 F.3d at 713; *In re Read–Rite Corp. Sec. Litig.,* 335 F.3d 843, 848–49 (9th Cir.2003). Indeed, in one case

Plaintiffs cite, the Ninth Circuit held that although allegations regarding the individual defendants' positions in the company may give rise to a "reasonable inference" those defendants were aware of the falsity of the Company's statements, they do not satisfy the PSLRA's pleading requirements. *Read–Rite*, 335 F.3d at 848–49.

■ Second, Plaintiffs' authority does not support a blanket assumption that individual director and officer defendants should be deemed to be aware of or have participated in a fraud by virtue of their positions in the defendant company. In the cases Plaintiffs cite that are from the Ninth Circuit, the complaints alleged detailed information regarding meetings, letters, reports, or other documentation showing the individual defendants knew about the fraud. *See Am. W.*, 320 F.3d at 942–43 (finding a strong inference of scienter where plaintiffs alleged detailed facts regarding meetings, letters, charts, and a settlement agreement); *In re Northpoint Communications Group, Inc. Sec. Litig.*, 221 F.Supp.2d 1090, 1104 (N.D.Cal.2002) (holding complaint raised a strong inference of scienter as to the CEO and CFO based on their duties and statements by confidential witness asserting those defendants were "in the know"); *In re Peoplesoft, Inc., Sec. Litig.*, No. C99–00472 WHA, 2000 WL 1737936, at *4 (N.D.Cal. May 25, 2000) (noting that rote allegations about "hands-on" managers and important transactions are not enough for scienter, but finding the complaint adequately alleged scienter because of the individual defendants' role in management and the nature of the fraud). In a Pennsylvania case Plaintiffs rely upon, scienter was similarly based on defendants' access to internal reports as well as the fact the representations concerned the company's leading product and its approval process before the Food and Drug Administration. *See In re Viropharma, Inc. Sec. Litig.*, No. 02–1627, 2003 U.S. Dist. LEXIS 5623, at *30–

32 (E.D.Pa. Apr. 3, 2003). Finally, other out-of-circuit cases Plaintiffs cite contained factual allegations regarding the individual defendants' personal involvement in the fraud. *Adams v. Kinder–Morgan, Inc.*, 340 F.3d 1083, 1086, 1106 (10th Cir.2003) (finding sufficient allegations of scienter as to CFO because he knew a key operation of the company was unprofitable but nevertheless reported it as a profit); *In re Qwest Communications Int'l, Inc. Sec. Litig.*, No. 01–RB–1451, 2004 U.S. Dist. LEXIS 584, at *48 (D.Colo. Jan.13, 2004) (allegations regarding defendants' stock sales and knowledge of specific accounting issues on the part of some of the individual defendants properly pleaded scienter); *In re CINAR Corp. Sec. Litig.*, 186 F.Supp.2d 279, 316–17 (E.D.N.Y.2002) (allegations of CFO's involvement in tax fraud scheme sufficient to plead scienter).

Contrary to Plaintiffs' position that scienter can be imputed to Defendants because of their positions in the Company, this Court has held that "a complaint does not adequately plead scienter by claiming that key officers knew the true facts by virtue of their " 'hands-on' " positions and involvement in the day-to-day management of the company." *In re Peerless Systems Corp. Sec. Litig.*, 182 F.Supp.2d 982, 993 (S.D.Cal.2002). Other courts in this circuit have also determined that a defendant's position in the company does not, without more, create a strong inference of scienter. *See, e.g., In re Splash Tech. Holdings Inc. Sec. Litig.*, 160 F.Supp.2d 1059, 1080–81 (N.D.Cal.2001); *In re Autodesk, Inc. Sec. Litig.*, 132 F.Supp.2d 833, 843–44 (N.D.Cal.2000). Rather than presume individual officer and director defendants must have known about a fraud by virtue of their positions within the defendant company, "the persuasive force of each situation must be evaluated individually." *Peoplesoft*, 2000 WL 1737936, at *4.

The allegations in this Complaint fail to give rise to a strong inference of scienter. Regarding the allegations of improper cash application, the most detail provided is in paragraph 54, which alleges that former Adecco North America CFO Mark Eaton, who regularly communicated with Adecco's Treasurer Patrick Dobler, who reported directly to Defendant Weber, was aware of the problem with Olsten's receivables at the time of the acquisition, and with Adecco's receivables following the 2000–2001 system conversion. (Compl. ¶ 54.) That paragraph also avers that Defendant Weber "attended a meeting at the Company's Melville, New York, North America headquarters where this problem was discussed as a significant concern for Swiss headquarters." *Id.*

These allegations are insufficient to implicate Defendant Weber in the improper application of new cash to old Accounts Receivables. The Complaint is vague as to the "problem" discussed at the meeting. As Defendants note, in the context of the paragraph, the "problem" could be referring to Olsten's receivables at the time of the acquisition and with Adecco's receivables following the 2000–2001 system conversion, or with the misapplication of cash receipts. *See id.* The Complaint also does not identify who else attended the meeting, or what was said during the meeting. *Cf. In re Homestore.com, Inc. Sec. Litg.*, 252 F.Supp.2d 1018, 1035 (C.D.Cal.2003) (holding that allegations that a defendant was aware of the scheme to defraud and participated in the transactions at issue in the complaint were non-specific and conclusory).

There are no allegations indicating any of the other individual Defendants participated in or ratified the practice of applying new cash to old receivables to inflate revenues and conceal the amount of uncollectible receivables and unapplied payments. Instead, the Complaint groups all individu-

al Defendants together to claim they all knew about this accounting violation. In paragraph 54, Plaintiffs allege the improper cash application practice was "well known throughout the Company." (Compl. ¶ 54.) The Complaint also alleges "[s]enior Adecco executives routinely discussed th[e] pervasive problem," *id.* ¶ 50, and that as "top officials at the Company" they had access to internal inaccurate reports. *Id.* ¶¶ 67, 68. The Complaint further alleges that "Plaintiffs believe that all individual defendants attended and/or participated in meetings that took place within the United States to discuss Adecco's financial problems arising out of its North American operations." *Id.* ¶ 16.

These allegations are too vague and conclusory to give rise to a strong inference of scienter on the part of each Defendant with respect to the misapplication of new cash to old and uncollectible receivables. In addition, the Complaint is silent as to whether the Defendants participated in the other accounting manipulations Adecco North America purportedly engaged in: billing customers at incorrect rates, improperly classifying workers, SUTA dumping, and delaying payments to vendors. Nor are there any allegations as to how and when the Defendants learned of those improprieties.

The Complaint's allegations regarding internal reports are also insufficient to give rise to a strong inference of scienter on the part of the individual Defendants. The Complaint describes the contents of the Aged Trial Balance Reports, weekly Flash Reports, and monthly reports, and states that the Defendants had access to them. *Id.* ¶¶ 64–68. The Complaint does not, however, describe how or when any of the individual Defendants received these reports, how the individual Defendants knew the reports contained false information, or the sources of Plaintiffs' informa-

tion regarding these reports. The absence of these allegations belies a strong inference of scienter. *See Silicon Graphics,* 183 F.3d at 985 (holding that to create a strong inference of scienter based on internal reports, plaintiffs must plead adequate corroborating details, including the sources of plaintiff's information regarding the reports, how plaintiff learned of the reports, who drafted the reports, and which officers reviewed the reports).

In sum, the Complaint's allegations that Defendants did in fact know about the fraud and should be presumed to have known about the fraud because of their positions in the Company and access to internal reports are insufficient to give rise to a strong inference of scienter.[3]

**B. Scienter Based on Temporal Proximity of the Company's January 12, 2004 Announcement to the Alleged Misrepresentations Regarding its Financial Condition**

■ On January 12, 2004, the Company issued a press release announcing a delay in 2003 year-end financials due in part to material weaknesses in internal controls at Adecco North America. (Compl. ¶¶ 3, 107.) Plaintiffs argue this press release is an admission of the improper cash application practice alleged in the Complaint. (Opp'n at 9–11.) The temporal proximity of this admission to the Company's allegedly false and misleading third quarter 2003 results and associated conference calls supports, according to Plaintiffs, a strong inference of scienter. Plaintiffs state that admissions shortly after a class period " 'have evidentiary relevance to the issue of scienter and falsity because they may provide insight into what the defendant knew during the class period.' " *Id.* at 9–10 (quoting *De-Marco v. DepoTech Corp.,* 149 F.Supp.2d 1212, 1223 n. 6 (S.D.Cal.2001)). Plaintiffs argue Defendants' post-class period statements support a strong inference that Defendants knew the adverse financial condition of the Company all along or at a minimum were deliberately reckless in issuing the Company's false and misleading financial statements shortly before revealing the truth about the Company's weak internal controls. According to Plaintiffs, this inference is further corroborated by the Complaint's allegation that Ernst & Young specifically warned Defendants during 2003 that it would not sign off on the improper accounting. (Compl. ¶ 57.)

■ At this time, these allegations do not give rise to a strong inference of scienter. The Complaint does not adequately link the improper accounting occurring in 2000–2001 to conceal the uncollectible receivables to the accounting issues raised by Ernst & Young in 2003 and the Company's January 12, 2004 announcement. The lack of this connection stems from an apparent inconsistency in the Complaint as to whether the alleged accounting improprieties occurred during the entire Class Period. Plaintiffs' temporal proximity ar-

---

**3.** Defendants also argue that Plaintiffs' scienter allegations are further undermined because the individual Defendants are officers and Defendants of Adecco, and the alleged accounting manipulations occurred in Adecco North America, a subsidiary. Plaintiffs respond that Adecco North America is a division, not a subsidiary, and that scienter can nevertheless be imputed to the individual Defendants and Adecco. The Court expresses no opinion as to the corporate relationship between Adecco North America and Defendant Adecco, as it would require the Court to consider evidence extrinsic to the Complaint. Further, the Court finds it unnecessary to decide whether Adecco North America is a subsidiary or a division of Adecco. Regardless of how that issue is ultimately resolved, the Complaint as currently pleaded does not adequately allege personal involvement or knowledge by the individual Defendants of the accounting manipulations charged in the Complaint.

gument presumes the accounting fraud spanned the Class Period. Paragraph 36 of the Complaint supports that position, averring that "[t]hroughout the Class Period, defendants caused Adecco to materially understate the Company's bad debt expenses by allocating new cash to old Accounts Receivable." *Id.* ¶ 36. That paragraph contains the allegation that Ernst & Young would not sign off on the 2003 annual report until Defendants corrected their improper accounting scheme. *Id.* However, in other portions of the Complaint, Plaintiffs focus only on the Company's 2000 and 2001 financial statements, stating those were false and misleading because "they failed to properly take allowances for doubtful accounts, and also failed to properly record revenues." *Id.* ¶ 71; *see id.* ¶ 125 ("at least the FY 2000–2001 financial statements remain false"). The Complaint is not clear why the Company's financial statements for 2002 were false, but during oral argument counsel explained they were false and misleading because they represented that the write-off taken that year was due to worsening economic conditions, and failed to mention material weaknesses in internal controls. (Hr'g Tr. 7:20–8:1.) The fraud related to that financial statement therefore is not due to accounting improprieties affecting the Company's revenues, but rather the reason for the write-off. Further, there are no allegations as to why the misapplication of new cash to old Accounts Receivable would have occurred after the Company wrote off its bad receivables in its 2002 year-end financial statement. Thus, while on the one hand Plaintiffs appear to allege Adecco North America engaged in ac-

counting fraud throughout the Class Period and the Company admitted this fraud in January 2004, other portions of the Complaint suggest the accounting manipulations only affected the Company's allowances and revenues in its 2000 and 2001 financial statements. This confusion undermines any inference of scienter.[4]

### C. Group Pleading Doctrine

Plaintiffs also rely on the group pleading doctrine, which allows a presumption that false and misleading information disseminated through documents were made by the collective action of the corporation's officers. *In re GlenFed, Inc.*, 60 F.3d 591, 593 (9th Cir.1995); *In re Syncor Int'l Corp. Sec. Litig.*, 327 F.Supp.2d 1149, 1171 (C.D.Cal.2004). The Ninth Circuit has not addressed whether the group pleading doctrine survives the PSLRA. However, the district courts within this circuit have come to differing conclusions. *Syncor*, 327 F.Supp.2d at 1171. In *Allison v. Brooktree*, 999 F.Supp. 1342 (S.D.Cal. 1998), Judge Miller found that the group pleading doctrine did not survive the PSLRA. *Allison*, 999 F.Supp. at 1350–51. Judge Miller stated, "[t]o permit a judicial presumption as to particularity simply cannot be reconciled with the statutory mandate that plaintiffs must plead specific facts as to each act or omission by the defendant." *Id.* at 1350. This Court concurs with Judge Miller's reasoning, and has so held in earlier cases. *See, e.g., In re Ashworth Inc. Sec. Litig.*, No. 99CV0121–L(JAH), 2000 WL 33176041, at *12 (S.D.Cal. July 18, 2000). Recognition of the group pleading doctrine would be at

---

**4.** Defendants argue that the lack of a restatement in this case should have been the death knell for this lawsuit. The lack of a restatement is not dispositive when a plaintiff has otherwise met the PSLRA's pleading requirements. *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir.2002). Because the Com-

plaint's falsity and remaining scienter allegations are deficient and Plaintiffs should be given an opportunity to amend, the Court finds it unnecessary and premature to determine the significance of the lack of a restatement on the viability of Plaintiffs' claims.

odds with the PSLRA's pleading requirements regarding scienter,[5] as recently recognized by the Fifth Circuit. *Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.,* 365 F.3d 353, 363–65 (5th Cir.2004).

## D. Scienter Based on Motive

### 1. Stock Sales

Unusual or suspicious stock sales can serve as circumstantial evidence of scienter. *Ronconi v. Larkin,* 253 F.3d 423, 434 (9th Cir.2001); *Silicon Graphics,* 183 F.3d at 986. "But not every sale of stock by a corporate insider shows that the share price is about to decline." *Ronconi,* 253 F.3d at 435. Accordingly, "courts have repeatedly held that the mere existence of stock sales does not raise a strong inference of fraudulent intent. [citation] Plaintiffs have the burden at the pleading stage of explaining why the stock sales were unusual or suspicious." *In re PetSmart, Inc. Sec. Litig.,* 61 F.Supp.2d 982, 1000 (D.Ariz.1999); *Ronconi,* 253 F.3d at 435; *Silicon Graphics,* 183 F.3d at 987. To meet this burden, the plaintiffs must show the trading was " 'in amounts dramatically out of line with prior trading practices, at times calculated to maximize personal benefit from undisclosed inside information.' " *PetSmart,* 61 F.Supp.2d at 1000 (quoting *Alfus v. Pyramid Technology Corp.,* 764 F.Supp. 598, 605 & n. 1 (N.D.Cal.1991)). The Ninth Circuit has identified three relevant factors when analyzing insider sales: " '(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history.' " *Ronconi,* 253 F.3d at 435 (quoting *Silicon Graphics,* 183 F.3d at 986). When a corporate insider sells only a small fraction of his shares, the inference of scienter is weakened. *PetSmart,* 61 F.Supp.2d at 1000. In addition, some courts have held that were an individual retains more shares than were sold, the resulting aggregate loss will defeat an inference of fraud. *Id.; see Silicon Graphics,* 183 F.3d at 986 (stating that "the proportion of shares actually sold by an insider to the volume of shares he could have sold is probative of whether the sale was unusual or suspicious").

■ The Complaint alleges that Defendant Jacobs is the chairman of the Jacobs Family Foundation, a private philanthropic organization with a 100% beneficial interest in KJ Jacobs AG. (Compl. ¶¶ 33, 135.) According to Plaintiffs, during December 2003, KJ Jacobs AG sold approximately 80,000 shares of Adecco common stock and transferred by way of gift over 6 million shares of Adecco common stock.[6] *Id.* ¶ 35. These shares were worth over $132 million less after January 12, 2004. *Id.*

The parties dispute how much control Defendant Jacobs had over KJ Jacobs AG's investment and voting decisions at the time of the stock trades. The Court finds it unnecessary to determine, for purposes of this motion, whether Defendant Jacobs directed the transactions. Even if he had, the Complaint does not allege sufficient facts regarding these stock transac-

---

5. This Court has recognized, however, that "there may be circumstances where it would be appropriate to attribute statements to a group of defendants, such as where a corporation's officers and directors are few in number and make corporate decisions on a group basis." *Ashworth,* 2000 WL 33176041, at *12 n. 3.

6. In their opposition, Plaintiffs allege KJ Jacobs AG was able to sell $196 million worth of Adecco stock on February 9, 2001. (*See* Opp'n at 3–4.) Because this stock sale is not alleged in the Complaint, the Court will not consider it for purposes of this motion. *See Sprewell v. Golden State Warriors,* 266 F.3d 979, 988 (9th Cir.2001), *amended by* 275 F.3d 1187 (9th Cir.2001) ("Review is limited to the contents of the complaint.")

tions from which to draw a strong inference of scienter.

The Complaint fails to allege facts indicating the stock transactions at issue were out of line with prior trading history. Further, the Complaint alleges stock transactions occurring in December 2003, *after* the Company wrote off uncollectible receivables in its year-end 2002 financial statements, and at a time that is not temporally proximate to the alleged accounting fraud occurring in 2000 and 2001. The timing of the alleged stock transactions do not, therefore, appear to be timed to "maximize the personal benefit from undisclosed inside information." *Silicon Graphics*, 183 F.3d at 986 (internal quotations omitted). Also weighing against a strong inference of scienter is the absence of any allegations of stock sales by the remaining individual Defendants. *Cf. Lipton*, 284 F.3d at 1036–37 (finding that one insider's stock sales did not provide an inference of fraudulent intent was reinforced by the fact he was the only insider to sell stock during the class period); *Ronconi*, 253 F.3d at 436 (holding that one defendant's trading supported only a weak inference of scienter because the other equally-knowledgeable insiders sold too soon to take advantage of their allegedly fraudulent statements). "One insider's well timed sales do not support the 'strong inference' required by the statute where the rest of the equally knowledgeable insiders act in a way inconsistent with the inference that the favorable characterizations of the company's affairs were known to be false when made." *Ronconi*, 253 F.3d at 436 (internal footnote omitted); *see also Acito v. IMC-ERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir.

1995) (holding that one individual defendant's stock sales did not give rise to a strong inference of scienter when he sold only 11% of holdings and other officers did not sell stock). Accordingly, the stock sales alleged do not give rise to a strong inference of scienter.

### 2. Desire to Conceal a Bad Management Decision

 Plaintiffs argue Defendants also had a motive to engage in accounting fraud. "Motive and opportunity are relevant to establishing scienter, though scienter cannot rest on those allegations alone." *In re Cornerstone Propane Partners, L.P. Sec. Litig.*, 355 F.Supp.2d 1069, 1091 (N.D.Cal.2005); *see Lipton*, 284 F.3d at 1038 (holding that generalized assertions of motive, without more, do not meet *Silicon Graphics'* heightened pleading requirements); *Silicon Graphics*, 183 F.3d at 974 (holding that facts indicating "a motive to commit fraud and opportunity to do so may provide some reasonable inference of intent, [but] they are not sufficient to establish a strong inference of deliberate recklessness."). Here, Plaintiffs maintain Defendants engaged in accounting improprieties to conceal the "disastrous consequences" of acquiring the Olsten corporation without conducting an adequate due-diligence investigation to uncover the tens if not hundreds of millions of dollars in uncollectible receivables.[7] (Opp'n at 13–14.)

Defendants respond that Plaintiffs' theory of motive fails because under applicable accounting rules, Adecco could have accounted for any uncollectible receivables

---

7. The Complaint also avers that following the disclosure of Adecco North America's accounting problems in 2004, Defendants Weber and Bowmer were forced to resign their positions at Adecco. (Compl. ¶¶ 32, 39.) These allegations are unsupported by any facts, and those Defendants' resignations are not *per se* indicative of scienter. *See Cornerstone*, 355 F.Supp.2d at 1093 ("Most major stock losses are often accompanied by management departures, and it would be unwise for courts to penalize directors for these decisions.").

that were on Olsten's books by decreasing the valuation of the receivables asset. Plaintiffs, in turn, contend that Defendants would then have been blamed for the decision to purchase Olsten and the disclosure would have impacted the Company's stock price.

The Court finds it unnecessary at this juncture to discuss which accounting methods Adecco could have used to address Olsten's uncollectible receivables and whether their availability undermines the Complaint. As currently pleaded, the Complaint's allegations that Defendants engaged in accounting fraud to conceal a poor management decision do not give rise to a strong inference of scienter. A desire to conceal mismanagement is not sufficient to show motive and opportunity. *Allison v. Brooktree Corp.*, No. 97–CV–0852 TW(POR), 1998 WL 34074832, at *10 (S.D.Cal. Nov. 27, 1998); *Kalnit v. Eichler*, 85 F.Supp.2d 232, 243 (S.D.N.Y.1999). Further, even if the alleged motive gave rise to a reasonable inference of scienter, the Complaint still fails to meet the pleading requirements for scienter in light of the weaknesses in its other scienter allegations.

**E. Scienter Allegations Viewed Collectively**

The Court must consider whether the totality of the Complaint's allegations, even though individually lacking, create a strong inference that the individual Defendants acted with deliberate or conscious recklessness. *Lipton*, 284 F.3d at 1038. Having reviewed the Complaint as a whole, the Court finds Plaintiffs fail to meet *Silicon Graphics'* stringent pleading requirements. The weaknesses in the Complaint's scienter allegations arise from the inadequate allegations of the accounting fraud. The Complaint does not provide the details necessary to support an inference that the Company's uncollectible receivables should have been written off

sometime before the 2002 year-end financial statement. Consequently, the Complaint does not adequately plead the individual Defendants knew the write-off should have been taken sooner. Further, there are no allegations tying the individual Defendants to Adecco North America's accounting other than the vague assertion that Defendant Weber indicated that Swiss headquarters were concerned about a "problem." Also needing clarification are the Complaint's allegations regarding when the accounting improprieties occurred. Finally, the Complaint has not adequately alleged a motive on the part of Defendants to engage in the accounting improprieties at issue in the Complaint. Accordingly, taken together, the Complaint's allegations do not give rise to a strong inference of scienter.

### SUFFICIENCY OF THE ALLEGATIONS OF A § 20(a) VIOLATION.

■ Section 20(a) of the 1934 Securities and Exchange Act provides for controlling person liability for every person who, directly or indirectly, controls any person liable under any of the provisions of this title. 15 U.S.C. § 78t(a). To establish control person liability, a plaintiff must show that a primary violation occurred, and that the defendant exercised actual power or control over the primary violator. *Am. W.*, 320 F.3d at 945; *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir.2000). Accordingly, because Plaintiffs' § 10(b) claim fails, the § 20(a) claim must be dismissed as well. *Heliotrope General, Inc. v. Ford Motor, Co.*, 189 F.3d 971, 978 (9th Cir.1999).

### LEAVE TO AMEND

■ Leave to amend a complaint should be freely granted unless amendment would be futile. *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052

(9th Cir.2003); *Lipton*, 284 F.3d at 1039. Defendants argue leave to amend should not be granted because Plaintiffs' opposition to this motion has not proffered any facts that would add to the Complaint and Plaintiff's theory of the case suffers from multiple incurable deficiencies. The Court disagrees. While the Complaint does not survive the instant motion to dismiss, this assessment is based purely on the adequacy of the pleadings as to falsity and scienter.[8] The Court finds it premature and therefore has not considered Defendants' arguments challenging the viability of Plaintiff's theory of the case. Accordingly, the Court will grant Plaintiffs leave to amend to address the pleading deficiencies discussed in this order.

## CONCLUSION

Having considered the parties' briefs, the record, oral argument, applicable law, and good cause appearing, **IT IS HEREBY ORDERED:**

1. Defendants' motion to dismiss is **GRANTED.**

2. The Consolidated Complaint is **DISMISSED WITHOUT PREJUDICE.**

3. Plaintiffs shall file and serve an amended complaint within 45 days of the date this order is stamped "Filed."

**IT IS SO ORDERED.**

---

8. Because the Complaint's falsity and scienter allegations do not meet the PSLRA's pleading requirements, the Court has not evaluated whether Plaintiffs have adequately pleaded loss causation.