**ALASKA ELECTRICAL PENSION FUND, On Behalf of Itself and All Others Similarly Situated, Plaintiffs,**

v.

**ADECCO S.A.; John Bowmer; Jerome Caille; and Felix A. Weber, Defendants.**

**In re Adecco S.A. Securities Litigation**

**This Document Relates to: All Actions**

**No. CIV. 04CV0129–M(WMC).**

United States District Court, S.D. California.

March 29, 2006.

Jeffrey W. Lawrence, William S. Lerach, Lerach Coughlin Stoia Geller Rudman and Robbins, Darren Jay Robbins, Rudman and Robbins, Robert S. Gans, Berstein Litowitz Berger and Grossmann, San Diego, CA, Peter D. Bull, Bull and Lifshitz, James E. Tullman, Weiss and Yourman, Catherine A. Torrell, Cohen Milstein Hausfeld and Toll, Arthur N. Abbey, Abbey and Ellis, New York, NY, Samuel H. Rudman, Lerach Coughlin Stoia Geller Rudman and Robbins, Melville, NY, Jeffrey W. Lawrence, Milberg Weiss Bershad Hynes and Lerach, San Francisco, CA, for Plaintiffs.

Julia E. Parry, Latham and Watkins LLP, San Diego, CA, for Defendants.

## ORDER: (1) GRANTING MOTION TO DISMISS AMENDED COMPLAINT; (2) DISMISSING AMENDED COMPLAINT WITH PREJUDICE

LORENZ, District Judge.

On January 30, 2006, this matter came on regularly for a hearing on Defendants' Motion to Dismiss the Consolidated Amended Complaint. Scott H. Saham of Lerach Coughlin Stoia Geller Rudman & Robbins, LLP appeared for Plaintiffs. Laurie B. Smilan of Latham & Watkins, LLP appeared for the Defendants.

Having carefully reviewed the parties' briefs, oral argument, and applicable law, the Court finds the Consolidated Amended Complaint ("Amended Complaint") does not meet the pleading requirements under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §§ 78u–4(b)(1) and (2), and therefore **GRANTS**

Defendants' motion to dismiss, and **DISMISSES** the Amended Complaint **WITH PREJUDICE.**

### BACKGROUND

Plaintiffs filed this action under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78(t)(a), and Rule 10b–5 of the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b–5. Plaintiffs allege violations of the statute and regulation on behalf of a class of investors who purchased Defendant Adecco S.A. ("Adecco" or "the Company") stock between March 16, 2000 and January 9, 2004 (the "Class Period"). (Consolidated Amended Complaint ("AC") ¶ 1.) Defendants are Adecco and four of its officers and directors. Defendant John P. Bowmer was Chairman of Adecco from February 2002 through the end of the Class Period and previously was CEO of the Adecco Group since its inception in 1996. *Id.* ¶ 47. Defendant Jerome Caille has been the CEO of Adecco since March 2002, and prior to that served as President of the Adecco Staffing division. *Id.* ¶ 48. Defendant Felix A. Weber was CFO of Adecco from 1998 until 2004. *Id.* ¶ 49. Defendant Klaus J. Jacobs is one of the Company's founders and currently co-Chairman of the Board of Directors of Adecco. *Id.* ¶¶ 50, 160.

Adecco is a Swiss company primarily engaged in providing personnel services to companies and industry worldwide. *Id.* ¶¶ 1, 46. Adecco provides these services by contract to businesses located throughout North America, Europe, Asia Pacific and Latin America. *Id.* ¶¶ 1, 46. The Company's North American ("Adecco North America") operations accounted for approximately 24% of total revenue at Adecco in 2003 with U.S. revenue over 3.8 billion Euros in 2003. *Id.* ¶¶ 35, 46. The Company's stock trades on the SWX Swiss Stock Exchange and is listed on Euronext Premier Marché. *Id.* ¶ 29. Adecco's stock is also traded as American Depositary Shares on the New York Stock Exchange. *Id.*

In March 2000, Adecco acquired Olsten Corporation, a U.S. company, primarily for its more advanced technology. *Id.* ¶¶ 2, 30, 61. After the Olsten takeover, Adecco North America converted its operating system to the legacy Olsten IT system. *Id.* ¶¶ 2, 52(i), 60. With the conversion, Defendants became aware of massive problems in the Company's North American receivables; not just with Olsten but also with Adecco's legacy accounts. *Id.* ¶¶ 2, 60.

During 2000 and 2001, Adecco had millions of dollars in bad debt it could not collect from customers who had gone bankrupt, become insolvent, or were otherwise unable to pay bills. *Id.* ¶¶ 3, 71. In addition, Adecco North America did not have an automatic system in place to match payments to the proper invoice, and as a result, payments were often manually credited to the wrong invoice. *Id.* ¶ 70. When this happened, many customers said they had already paid the outstanding amount and refused to pay the new invoice until Adecco "got its act together." *Id.* Further, many of the inherited Olsten customers refused to pay because Adecco utilized a different process when billing customers. *Id.* ¶ 72. The combination of millions of dollars in uncollectible debt and the amount that customers refused to pay resulted in hundreds of millions of dollars of outstanding receivables on Adecco's books during 2000 and 2001. *Id.* ¶¶ 3, 71.

According to Plaintiffs, when faced with the problem of these uncollectible receivables, Defendants did not disclose them to the market and write them off. *Id.* ¶ 3. Instead, Defendants chose to cover up the uncollectible receivables and violate Generally Accepted Accounting Principles ("GAAP"). Defendants disseminated

press releases and filed year-end financial statements for 2000 and 2001 that understated the Company's allowance for doubtful accounts by over $100 million and therefore overstated earnings.[1]  *Id.*  ¶¶ 4, 10, 11, 134–36, 138, 140; *see id.* ¶¶ 90–125. Plaintiffs maintain that during the Class Period, Defendants issued false and misleading financial statements that failed to disclose material internal control weaknesses and pervasive problems concerning Adecco's account receivables in Adecco North America.  *Id.* ¶ 9.

Plaintiffs allege Defendants concealed the uncollectible receivables by, among other things, improperly applying current cash receipts that were intended to satisfy recent customer invoices to old outstanding receivables.  *Id.* ¶¶ 3, 54, 65, 140, 145.  Plaintiffs also aver that Adecco North America manipulated its financial statements and violated GAAP by billing customers at incorrect rates, improperly classifying its workers, engaging in State Unemployment Tax Act ("SUTA") dumping, delaying its payments to vendors, and violating Regulation S–K 303.  *Id.* ¶¶ 58, 78–82, 88–89, 141–43, 145, 147–52.

On June 24, 2003, as part of its year-end financial statements, Adecco wrote off receivables that had been on its books for more than 90 days.  *Id.* ¶¶ 5, 11, 73.  The amount written off was approximately $95 million Euros (approximately $100 million). *Id.* ¶¶ 5, 11, 73.  Prior to that time, some receivables had remained on Adecco's books more for two years.  *Id.* ¶ 73.  The disclosure accompanying this write off was incomplete, false, and misleading because it did not state that the true reason for the write-off, which was the result of material weaknesses in the Company's internal controls, had yet to be corrected.  *Id.* ¶¶ 5, 11.

Another 28 million Euros (approximately $35 million) were written off for year-end 2003.  *Id.* ¶ 11.

Adecco switched auditors from Arthur Andersen to Ernst & Young, LLP ("E & Y") in late 2002.  *Id.* ¶¶ 4, 76.  In early 2003, E & Y warned Defendants they needed to correct the misallocation of current cash receipts by year-end 2003.  *Id.* ¶¶ 4, 54, 76.  Toward the end of that year, because the Company had failed to correct its internal control problems, E & Y informed Defendants it would not sign off on the Company's 2003 year-end financial statements.  *Id.* ¶¶ 6, 54, 76.

On January 12, 2004, Adecco issued a press release entitled "Adecco S.A. Delays Announcement of FY 2003 Audited Results."  *Id.* ¶¶ 17, 127.  The press release stated in part:

> Adecco S.A. announced that it does not expect the audit of its consolidated financial statements for the 2003 fiscal year, ended on December 28, 2003, to be completed by Adecco's auditors, by the previously announced release date of February 4, 2004.
>
> The reasons for the delay in completion of the audit include:
>
> — The identification of ***material weaknesses in internal controls in the Company's North American operations of Adecco Staffing***
>
> — ***The resolution of possible accounting, control and compliance issues*** in the Company's operations in certain countries
>
> — The completion of the Company's efforts to address these matters and determine their effect on the Company's consolidated financial statements.

---

1.  Adecco is a foreign company and therefore does not have to issue its financial statements for any given fiscal year until six months after the close of that year.  (AC ¶ 10.)  Thus, Adec- co's year 2000 financial statements were not issued until June 2001, and its 2001 financial statement was issued in June 2002.  *Id.*

In this regard an independent Counsel has been appointed by the Audit & Finance Committee of the Company's Board of Directors to conduct an investigation.

The Company is not yet able to predict when the 2003 audit of its consolidated financial statements will be completed.

*Id.* ¶ 17, 126. Following this news, Adecco's stock dropped from almost $17 per share to as low as $10 per share. *Id.* ¶¶ 8, 17, 20–21. The SWX Swiss Stock Exchange, SEC, and United States Department of Justice initiated investigations into possible violations of the law. *Id.* ¶¶ 19, 32, 128, 130. The SEC subsequently concluded its investigation without taking action. (Horton Decl. Ex. 1.)

On January 16, 2004, the Company issued a press release that stated, in part:

> *Material weaknesses, related to Adecco Staffing North America, include IT system security; reconciliation of payroll bank accounts; application of accounts receivable;* and several issues affecting revenue recognition including lack of systematic documentation of agreed rates and hours; billing errors not timely identified and corrected; and lack of segregation of duties in the branches increasing the likelihood of undetected errors. Of the foregoing, some have already been corrected, and the balance are being actively addressed. The Audit and Finance Committee of the Board initiated certain measures to help to identify any further weaknesses and permanently resolve them. The chief focus of these measures is to investigate accounting, control and compliance issues in the U.S. and in certain other countries, as well as to investigate accusations made

by "whistleblowers" in the US. Outside of the US, these other countries together accounted for less than 10% of the group's reported 2002 net service revenues.

(AC ¶¶ 8, 18, 128). Following the announcements, E & Y and the law firm of Paul Weiss conducted an investigation that cost Adecco over $120 million. *Id.* ¶¶ 8, 59, 68. This investigation did not review the Company's 2000 and 2001 financial statements. *Id.* ¶¶ 8, 59, 144.

Several plaintiffs filed securities fraud class actions against Adecco shortly after these announcements, contending the Company would have to restate its FY 2000–2003 results to eliminate millions in improperly-recorded revenues. The cases were filed in this district and in the Southern District of New York. The New York cases were transferred to this district, and all actions were consolidated.

In June 2004, Adecco released its 2003 Annual Report that included an additional write off of $35 million in bad receivables. (*Id.* ¶¶ 8, 59, 133; Parry Decl.[2] Ex. H.) Adecco announced in this report that its "accounts were signed by [the] auditors with no qualification, no restatement of prior year results and with no evidence of material irregularities." (Parry Decl. Ex. H at 599.) Plaintiffs allege Adecco's 2003 Annual Report conceded problems in controls had existed and that it had not just been overcautiousness on the part of the Board or the Company's outside officers. (AC ¶ 133.) Defendant Bowmer hoped that the "unfortunate episode" was ending, and stated that Adecco had "taken a number of significant steps to reinforce our audit and control functions throughout the Company." *Id.* In the report, Defendant Caille stated that Adecco had "used this

---

**2.** The Parry Declaration was filed in support of Defendants' motion to dismiss the Consolidated Complaint on November 12, 2004.

opportunity to review [its] operations and systems in the U.S. and drive process efficiencies as well as strengthen[ ] ... internal controls." *Id.*

On September 13, 2004, Plaintiffs filed a Consolidated Complaint. The Defendants who had been served moved to dismiss, and by order dated May 16, 2005, the Court granted Defendants' motion and dismissed the Consolidated Complaint without prejudice. *Alaska Elec. Pension Fund v. Adecco S.A.*, 371 F.Supp.2d 1203 (S.D.Cal.2005). Plaintiffs filed a Consolidated Amended Complaint ("Amended Complaint"), alleging Defendants issued positive statements throughout the Class Period regarding the Company's financial status that were false and misleading as they failed to disclose: (1) the Company's material internal control weaknesses; (2) the Company's extremely large amount of uncollectible receivables; (3) the Company's 2000 and 2001 financial statements, which were operative until June 2003 were in fact false as they understated the Company's bad debt expense; and (4) the true reason for the write off in year-end 2002. *Id.* ¶¶ 11–12. This conduct caused Adecco's stock to trade at inflated levels, which in turn allowed Adecco to complete a public offering of $533 million worth of convertible bonds on July 23, 2003. *Id.* ¶ 12. The Defendants who have been served move to dismiss the Amended Complaint.

## APPLICABLE LAW REGARDING MOTIONS TO DISMISS SECURITIES CLASS ACTIONS

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir.2001). Dismissal of a claim under this rule is appropriate only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957);

*Navarro*, 250 F.3d at 732. In reviewing a motion to dismiss under Rule 12(b)(6), the court must assume the truth of all factual allegations and must construe them in the light most favorable to the nonmoving party. *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir.2002); *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir.1996). However, legal conclusions need not be taken as true merely because they are cast in the form of factual allegations. *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir.1987); *Western Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir.1981).

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful to use in connection with the mails or facilities of interstate commerce any "manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commissioner may prescribe." 15 U.S.C. § 78j. SEC Rule 10b–5, promulgated under section 10(b), provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. The elements of a Rule 10b–5 claim are: (1) a misrepresentation or omission of a material fact; (2) scienter; (3) causation; (4) reliance; and

(5) damages. *In re Daou Sys., Inc. Sec. Litig.,* 411 F.3d 1006, 1014 (9th Cir.2005), *cert. denied,* —— U.S. ——, 126 S.Ct. 1335, 164 L.Ed.2d 51 (2006).

Claims brought under Rule 10b–5 and § 10(b) must meet Federal Rule of Civil Procedure 9(b)'s particularity requirement that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b); *see Daou,* 411 F.3d at 1014; *Yourish v. Cal. Amplifier,* 191 F.3d 983, 993 (9th Cir.1999). In addition, in 1995, Congress enacted the PSLRA and altered the pleading requirements in private securities fraud litigation by requiring a complaint " 'plead with particularity both falsity and scienter.' " *Daou,* 411 F.3d at 1014 (quoting *Gompper v. VISX, Inc.,* 298 F.3d 893, 895 (9th Cir. 2002)). As interpreted by the Ninth Circuit, a complaint alleging securities fraud "must now 'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.' " *Id.* (quoting *Gompper,* 298 F.3d at 895).

### SUFFICIENCY OF THE ALLEGATIONS OF VIOLATIONS OF § 10(B) AND RULE 10B–5

### I. *Misleading Statements or Omissions*

Plaintiffs argue Defendants violated GAAP by causing the Company to recognize revenue improperly. (AC ¶ 145.) In particular, Plaintiffs contend Defendants overstated Adecco's revenues in its year-end financial statements for 2000 and 2001 by failing to increase the Company's allowance for bad debt reserves. Plaintiffs further allege the Company should have written off the uncollectible receivables earlier than it did. Regarding the write-down,

Plaintiffs maintain Adecco's year-end 2002 financial statement was materially false and misleading because it attributed the write-off to worsening economic conditions and failed to mentioned the material weaknesses in internal controls. The Amended Complaint alleges Defendants perpetuated this accounting fraud by: (1) applying new moneys received from customers to old outstanding invoices; (2) billing customers at incorrect rates; (3) engaging in SUTA dumping; (4) delaying payment of vendor invoices; and (5) violating Regulation S–K 303. *Id.* ¶¶ 3, 54, 58, 65, 78–82, 88–89, 140–43, 147–52.

■ Plaintiff's theory of malfeasance rests on accounting fraud. "To properly state a claim for accounting fraud, plaintiffs must plead facts sufficient to support a conclusion that defendant prepared the fraudulent financial statements and that the alleged financial fraud was material." *Daou,* 411 F.3d at 1016 (internal quotations and alterations omitted). "When pleading irregularities in revenue recognition, plaintiffs should allege: (1) such basic details as the approximate amount by which revenues and earnings were overstated; (2) the products involved in the contingent transaction; (3) the dates of any of the transactions; or (4) the identities of any of the customers or [company] employees involved in the transaction." *Id.* (alteration in original) (internal quotations omitted). Although plaintiffs need not allege each of those particular details, they must allege enough to allow a court to " 'discern whether the alleged GAAP violations were minor or technical in nature, or whether they constituted widespread and significant inflation of revenue.' " *Id.* at 1017 (quoting *In re McKesson HBOC, Inc. Sec. Litig.,* 126 F.Supp.2d 1248, 1273 (N.D.Cal.2000)). Thus, to support a claim of fraud, a plaintiff must plead with particularity how the accounting manipulations

"affected the company's financial statements and whether they were material in light of the company's overall financial position." *Id.* at 1018.

### A. The Company's Reserves and Write Down of Uncollectible Receivables

■ Plaintiffs allege the Company's 2000 and 2001 year-end financial statements understated Adecco's allowance for uncollectible receivables in the amount of $100 million, and that the Company should have written off that bad debt before year-end 2002. Understatements of bad debt reserves can support a securities fraud claim because "[c]ompanies are obliged to make reasonable predictions about the collectability of their accounts receivable. Underestimates of bad debt reserves lead to overstatement of income, and ultimately inflation of stock price." *Kane v. Madge Networks N.V.*, No. C–96–20652–RMW, 2000 WL 33208116, at * 5 (N.D.Cal. May 26, 2000). However, a bare allegation that bad debt reserves were inadequate is insufficient "because even reasonable predictions turn out to be wrong. Instead, plaintiffs must allege with particularity facts that show the initial prediction was 'a falsehood.'" *Id.* (quoting *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1549 (9th Cir.1994) (en banc)). A company's reserve amounts can be "'fraudulent only if, when established, the responsible parties knew or should have known that they were derived in a manner inconsistent with reasonable accounting practices.'" *In re GlenFed*, 42 F.3d at 1549 n. 10 (quoting *Christidis v. First Penn. Mortgage Trust*, 717 F.2d 96, 100 (3d Cir.1983)). Accordingly, a complaint alleging fraud based on understated reserves must "include details about when and to what level the accounts receivable should have been written down, when and to what level the allowance should have been changed, why the allowance made by the corporation was unrea-

sonable in light of the [bed debt] experienced, and how many accounts ultimately were uncollectible." *In re Loewen Group Inc. Sec. Litig.*, No. Civ.A. 98–6740, 2004 WL 1853137, at *11 (E.D.Pa. Aug.18, 2004).

■ Similarly, to support their claim Defendants should have written off the uncollectible receivables before the year-end 2002 financials, Plaintiffs must allege facts showing Defendants knew, when preparing the year-end financials for 2000 and 2001, that the receivables should have been written off, but they fraudulently chose to delay the write-down. *See In re PetSmart, Inc. Sec. Litig.*, 61 F.Supp.2d 982, 993 (D.Ariz.1999) (finding the complaint's theory that a write-down of obsolete inventory should have been taken earlier to be deficient because the pleading "fail[ed] to include any particularized facts indicating that the timing of the write-down was unusual or reckless"); *see also In re K–Tel Int'l. Inc. Sec. Litig.*, 300 F.3d 881, 891 (8th Cir.2002) ("'Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud.'") (quoting *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 53 (2d Cir.1995)). "[A] delinquent write-down of the impaired assets, without anything more, does not state a claim of securities fraud, stating at best a bad business decision." *In re ICN Pharms., Inc. Sec. Litig.*, 299 F.Supp.2d 1055, 1065 (C.D.Cal. 2004).

The order dismissing the Consolidated Complaint found deficient the allegations regarding the Company's allowance for bad receivables and its failure to write off uncollectible receivables before year-end 2002 financials. *Adecco*, 371 F.Supp.2d at 1213–14. In particular, the Court found there were no factual allegations that Defendants knew when preparing the Company's 2000 and 2001 financial statements

that certain accounts at Adecco North America were uncollectible and should have been written off during that time frame. *Id.* at 1213. To the contrary, the Complaint suggested Adecco North America intended to collect the outstanding receivables, alleging that after the Olsten acquisition, "Adecco North American corporate offices instructed every branch to begin making efforts to collect the outstanding receivables." *Id.* There were no allegations explaining why the allegedly uncollectible receivables were outside of the range provided for by the Company's allowance for doubtful accounts, and by how much. *Id.* The Court also found the Consolidated Complaint did not contain factual allegations regarding the amount of Adecco North America's revenue inflation and quantifying the impact of Adecco North America's financials on Adecco's consolidated financial statements for its worldwide operations. *Id.* at 1214.

Plaintiffs maintain the Amended Complaint addresses these issues and is based upon the testimony of confidential witnesses. CW1, a former Senior Vice President of Adecco North America who later held higher top executive positions, helped negotiate the Olsten–Adecco merger. (AC ¶¶ 52(a), 60.) CW1 reports that Olsten had done a poor job in keeping on top of its receivables and collections. *Id.* ¶ 60. Plaintiffs argue that part of the reason Adecco acquired Olsten was for its operating system, and according to CW14, a former business analyst for Adecco Staffing North America, following the merger Adecco converted from its legacy systems over to Olsten's system. *Id.* ¶¶ 52(n), 61. CW14 and CW5 (a former Adecco technical sales manager) attest this process took over a year to complete. *Id.* ¶¶ 52(e), 61. After the system changeover, Adecco discovered massive problems in Adecco's North American receivables as well as Olsten's receivables. *Id.* ¶¶ 60–61.

According to CW1, CW8, CW9, and CW11, after the acquisition and during 2000 and 2001, the Company discovered it would be unable to collect tens, if not hundreds of millions in receivables from Olsten's customers who had gone bankrupt or who had unresolved billing disputes. *Id.* ¶¶ 3, 52(h), 52(i), 52(k), 56, 60, 62, 63–64. Plaintiffs' confidential witnesses report that because Adecco North America's operations did not have an automatic system in place to match payments to the proper invoice, payments were often manually credited to the wrong invoice. *Id.* ¶¶ 52(i), 52(k), 69–70. When this happened, many customers contended they had already paid the outstanding amount and refused to pay the new invoice until Adecco North America determined the correct outstanding amount. *Id.* at 70. This issue compounded Adecco North America's problems with uncollectible receivables. *Id.* CW9 reports that many of the inherited Olsten customers refused to pay invoices because Adecco utilized a process different from Olsten when billing customers. *Id.* ¶ 72. Plaintiffs also allege that as of May 2001, according to CW11, the aggregate "unapplied payments" figure was in the tens of millions of dollars, and estimated to be about $40 million by a former executive. *Id.* ¶ 67.

Plaintiffs maintain the understatement of doubtful accounts in North America was material to investors because Adecco's North American operations accounted for approximately 28% of Adecco's worldwide revenue in 2001 (27% in 2002 and 24% in 2003). *Id.* ¶¶ 56, 63. Additionally, the North American operations' allowance for doubtful accounts was 28% in 2001, 26% in 2002, and 24% in 2003 of the entire Company. *Id.* ¶ 63.

Having reviewed the amended pleading in its entirety, the Court is not persuaded Plaintiffs have adequately alleged an un-

derstatement of doubtful accounts, or that the Company committed fraud by failing to take a write-off earlier. The first deficiency is that the Amended Complaint does not plead sufficient facts to support its allegation the Company's 2000 and 2001 year-end financial statements overstated revenues and understated allowance of bad debt by approximately $100 million. *See id.* ¶ 11. To support that statement, the Amended Complaint must allege facts that support the inference Adecco should have increased its reserves in its 2000 and 2001 year-end financial statements by $100 million (or alternatively, written off that amount). Instead, the Amended Complaint reiterates the vague and conclusory assertion that the Company had "tens if not hundreds of millions" in uncollectible revenue. The only allegations that attempt to quantify the amount of uncollectible receivables come from two confidential witnesses. CW5 relates that in 2001, Deutsche Bank was 360 days past due on over $100,000 in accounts receivable, and Kodak was approximately 180 days past due on a $200,000 outstanding balance. *Id.* ¶ 52(e). CW17 states that St. Paul Insurance, AIG, CitiMortgage, and Excel Shipping & Logistics had outstanding balances in the tens of thousands of dollars, and that MetLife and IBM were two other customer accounts that had even larger outstanding receivables in the very high tens of thousands of dollars to over $100,000. *Id.* ¶ 52(q). CW16 also reports that three legacy Olsten customers had outstanding receivables, one dating as far back as 1999, but notably that confidential witness does not state the amount of outstanding receivables. *See id.* ¶ 52(p). CW2 recalls "that her branch wrote off thousands in outstanding receivables." *Id.* ¶ 52(b).

The total amount of outstanding receivables discussed by CW5 and CW17 is approximately $1 million. Although the Amended Complaint alleges the "outstanding receivables from CW5's branch were indicative of receivables outstanding at Adecco's more than 1500 North American offices," *id.* ¶ 52(e), that conclusion is not supported by allegations of any confidential witness who would be in a position to make that extrapolation or compute the total amount of uncollectible receivables that should have been reserved for to be $100 million. *Cf. Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 155 (3d Cir.2004) ("Plaintiffs repeatedly attribute specific nationwide information and statistics regarding Chubb's performance to former employees who worked in local branch offices. These sources have not been described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."). CW5, CW16, and CW 17 also appear to be low-level employees,[3] and the Amended Complaint does not contain any allegations indicating how they would be privy to how delinquent accounts would be reserved for in the Company's worldwide financial statements. Further, the information provided by the confidential witnesses is incomplete. CW2 states thousands in outstanding receivables were written off, but does not state whether they had been reserved for. CW5, CW16, and CW17 indicate certain accounts were past due, but they do not state whether those outstanding receivables were reserved for, had to be written off, or were ultimately collected. Indeed, certain of the Amended Complaint's allegations indicate the Company intended to collect its outstanding receivables. For example, the

---

**3.** CW 5 is a former Adecco sales manager. (AC ¶ 52(e).) CW16 is a former collections specialist. *Id.* ¶ 52(p). CW17 is a former Adecco Collections Department employee. *Id.* ¶ 52(q).

Amended Complaint indicates Adecco North America intended to collect the outstanding receivables, alleging that "following discovery of the Olsten accounts receivable problem and the Adecco accounts receivable problem, the Melville, New York, corporate office delegated to the hundreds of branch offices the actual collection function because the problems were so pervasive. Corporate put various incentives in place at the branch level to encourage collecting on old accounts receivable more quickly." (AC ¶ 85.) These allegations therefore, do not adequately plead falsity regarding the Company's 2000 or 2001 year-end financial statements, or falsity in Adecco's 2002 year-end statement's discussion of the write-off.

### B. Application of Current Cash Receipts to Old Receivables

■ As with the Consolidated Complaint, the Amended Complaint alleges accountants in the Cash Application division of the Corporate Accounts Receivable Department in Melville, New York violated GAAP and manipulated the Company's 2000 and 2001 year-end financial statements by applying new receivables to old and uncollectible accounts. *Id.* ¶¶ 3, 65–73, 140. The Amended Complaint attributes the misapplication of payments to different causes. Certain paragraphs of the Complaint suggest the misapplication was purposeful, and intended to allow Defendants to avoid writing off the uncollectible receivables and to understate Adecco's reserves and overstate earnings. Paragraph 3 alleges that "Adecco was faced with either disclosing and writing off these [outstanding] receivables (and thereby reducing its net income) or trying to cover it up. *The defendants chose the latter course: they attempted to 'work off' the receivables by, among other things, using current funds to pay old debts.*" *Id.* ¶ 3 (emphasis added). Similarly, paragraph 65 states, "[a]ccording to CW1, *in order to address the massive uncollected receivables discussed above without having to write them off,* current cash receipts were applied to old accounts receivable." *Id.* ¶ 65 (emphasis added); *see id.* ¶ 50 ("At approximately the same time [as KJ Jacobs AG sold $196 million worth of Adecco stock], *the Company started concealing its uncollectible receivables by applying newly received moneys to old receivables.*") (emphasis added); *id.* ¶ 64 ("Rather than acknowledge the extensive problems and accurately reporting the financial results of the Company, *defendants chose to cover-up the problem with a variety of manipulations.*") (emphasis added).

Other paragraphs of the Complaint, however, ascribe the misapplication of cash to "material weaknesses in internal controls." *See id.* ¶ 6 (stating that the Company had failed to correct its internal control problems *"which continued to allow the application of new moneys to old receivables"*) (emphasis added); *id.* ¶ 12 ("[t]he *material weaknesses in internal controls referenced herein also allowed the company to apply new moneys to old receivables,* in violation of Generally Accepted Accounting Principles ("GAAP")" (emphasis added).) CW1, who in another paragraph indicated the improper application was directed by Defendants, (*see id.* ¶ 65), alleges also that the Company's "weaknesses in internal controls allowed the Company to violate GAAP by applying new moneys to old receivables in order to eliminate them from the Company's books." *Id.* ¶ 52(a). Similarly, paragraph 55 alleges "[t]his lack of accounting controls resulted in the improper application of accounts receivable and a material understatement of the Company's uncollectible accounts, resulting in overstated earnings during the Class Period." *Id.* ¶ 55; *see id.* ¶ 68 ("These material weaknesses which are described, in part, above, allowed Adecco's

financial statements to be materially misstated during the Class Period.").

Having reviewed the Amended Complaint in its entirety, the Court is not persuaded Plaintiffs properly alleged misrepresentations and omissions based on the application of current cash receipts to old receivables. This Court rejected the Consolidated Complaint's allegations regarding this issue in part because the pleading did not corroborate its assertions with any examples. *Adecco*, 371 F.Supp.2d at 1214. This deficiency remains in the Amended Complaint. Although CW1 now is the source for certain allegations regarding misapplication of receivables, that witness does not provide any examples of the improper cash applications, nor are there any allegations quantifying the impact of the alleged misapplication on Adecco's 2000 and 2001 year-end financial statements. Further, the Amended Complaint contains a significant inconsistency. As discussed above, certain paragraphs allege a purposeful scheme by Defendants to apply new moneys to old receivables. Other testimonials, however, suggest the misapplication of current cash receipts was not intentional, but due to the Company's computer system. For example, CW11 attributes the difficulty in matching payments received to corresponding accounts receivable to the lack of "an automatic system in place at the corporate North American office" that required matching to be done manually (AC ¶¶ 52(k), 69–70.) Similarly, CW9 recounts that Adecco was *unable* to apply customer payments to proper invoices. *Id.* ¶ 52(i). These allegations suggest at most poor management, not fraud.

Further, the allegations regarding the confidential witnesses who Plaintiffs relied upon are deficient. There is an absence of allegations indicating how those witnesses possess the knowledge they purport to report. CW1 "is a former Senior Vice President of Adecco North America who later held other higher top executive positions," *id.* ¶ 52(a), but there are no averments regarding the nature of that witnesses' employment or explain how that witness would have obtained the information presented. Similarly, there are no allegations regarding how CW9 and CW11 learned of the information attributed to them. Accordingly, the Amended Complaint fails to properly plead falsity or omissions regarding the improper application of current cash receipts to old accounts receivable.

## C. Violation of Regulation S–K 303

The Amended Complaint advances a new theory of liability. In particular, Plaintiffs allege Defendants violated Rule 10b–5 by failing to comply with Item 303 of Regulation S–K. *See id.* ¶¶ 147–52. "S–K 303 requires a company to include in its SEC filings a discussion of 'any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.'" *Oran v. Stafford*, 226 F.3d 275, 287 (3d Cir.2000) (quoting 17 C.F.R. § 229.303(a)(3)(ii)). According to Plaintiffs, Adecco violated S–K 303 by failing to disclose: (1) the company had "material internal control weaknesses" in 2000 and 2001; (2) the acquisition of Olsten had caused a pervasive problem with aging receivables in its North American segment; (3) the Company had failed to properly take allowances for doubtful accounts for at least 2000 and 2001 and that no write-off for these receivables was taken until year-end December 31, 2002; and (4) when the Company first announced it was taking a large write-off for its bad debts, the Company failed to disclose the true reason for the write-off. (AC ¶ 152.)

The Court is unpersuaded. "The standards for disclosure under section 10(b) differ from the standards for disclosure under 17 C.F.R. § 229.303." *Wietschner v. Monterey Pasta Co.*, 294 F.Supp.2d 1102, 1118 (N.D.Cal.2003). Consequently, "demonstration of a violation of the disclosure requirements of Item 303 does not lead inevitably to the conclusion that such disclosure would be required under Rule 10b–5. Such a duty to disclose must be separately shown." *Alfus v. Pyramid Tech. Corp.*, 764 F.Supp. 598, 608 (N.D.Cal.1991); *In re Caere Corporate Sec. Litig.*, 837 F.Supp. 1054, 1061 n. 4 (N.D.Cal.1993) ("The fact that Defendants may or may not have violated Item 303 is irrelevant to Plaintiffs' Rule 10b–5 claims."); *Oran*, 226 F.3d at 287–88 (quoting *Alfus*). Accordingly, Plaintiffs' allegations based on SEC Regulation S–K 303 are insufficient to state a Rule 10b–5 claim.

### D. Remaining Accounting Improprieties

■ The Consolidated Complaint alleged Defendants manipulated the Company's financial statements by: (1) billing customers at incorrect rates; (2) improperly classified its workers; (3) engaged in SUTA dumping; and (4) delayed its payments to vendors. The Court found these allegations deficient because there were no facts regarding what impact these accounting improprieties had on Adecco North America's revenues or more importantly, Adecco's consolidated worldwide financial results. *Adecco*, 371 F.Supp.2d at 1215–16. The Amended Complaint reiterates these allegations. (AC ¶¶ 58, 78–82, 88–89, 141–43.)

The Amended Complaint and Consolidated Complaint contain virtually identical allegations regarding Defendants' alleged practices of: improperly billing customers at high rates; improperly classifying its workers for compensation purposes and candidates' marital status and number of dependents; and delaying payment to vendors. (*Compare* Consolidated Complaint ("CC") ¶¶ 59–63, 69–70 *with* AC ¶¶ 78–82, 88–89.) The only difference is that the Amended Complaint attributes these averments to CW1 and CW6. (AC ¶¶ 52(f), 78–82, 88–89.) This additional information does not address the deficiencies discussed in this Court's order dismissing the Consolidated Complaint. There is no information indicating how CW1 and CW6 would have learned about these facts. Further, these confidential witnesses do not provide any allegations quantifying the impact of these alleged improprieties on Adecco North America's revenues, or more importantly, Adecco's worldwide year-end financial results for 2000 and 2001.

The two pleadings are also almost indistinguishable regarding Plaintiffs' SUTA dumping claim. (*Compare* CC ¶ 40 *with* AC ¶ 58.) The Amended Complaint does not attribute the allegations to any confidential witnesses, and again fails to plead facts indicating what impact this accounting irregularity had on Adecco North America's finances or Adecco's worldwide year-end financial reports for 2000 and 2001.

In brief, the Amended Complaint does not plead sufficient facts to support a Rule 10b–5 claim based on these miscellaneous accounting improprieties. Like the Consolidated Complaint, the Amended Complaint's allegations do not allow a court to discern whether the accounting manipulations "'were minor or technical in nature, or whether they constituted widespread and significant inflation of revenue.'" *Daou*, 411 F.3d at 1017 (quoting *McKesson*, 126 F.Supp.2d at 1273).

## II. *Scienter*

The PSLRA requires federal securities complaints to state with particularity facts giving rise to a strong inference the defen-

dants acted with scienter. 15 U.S.C. § 78u–4(b)(2). Scienter is defined as "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The Ninth Circuit has interpreted the PSLRA as requiring plaintiff to "plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir.1999). Recklessness satisfies the scienter requirement only insofar as it reflects some degree of conscious or deliberate misconduct; *i.e.*, "a degree of recklessness that strongly suggests actual intent." *Id.* at 979. In determining whether plaintiffs have adequately pled scienter, courts must consider " 'whether the total of plaintiffs' allegations, even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness.' " *No. 84 Employer–Teamster Jt. Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 938 (9th Cir. 2003) (quoting *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1038 (9th Cir.2002)). When conducting this analysis, the court must consider all reasonable inferences, whether or not favorable to the plaintiffs. *Daou*, 411 F.3d at 1022.

## A. Scienter Based on Defendants' Awareness of and Involvement in Accounting Manipulations

■ Plaintiffs argue they have adequately pled scienter based on the Defendants' awareness of and involvement in the accounting manipulations alleged. Although violations of GAAP standards can provide evidence of scienter, *Daou*, 411 F.3d at 1016, a failure to follow GAAP, without more, does not establish scienter. *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 390. Rather, plaintiffs must allege that the defendants "knew or must have been aware of the improper revenue recognition" or "intentionally or knowingly falsified the financial statements." *Id.* at 390–91.

According to Plaintiffs, because Defendants were top-ranking officers of the Company, it strains credulity to believe they would not have been aware of the improper accounting alleged in the Amended Complaint. Plaintiffs contend the Ninth Circuit held that defendants' positions in a company can create a "reasonable inference" that the defendants would be aware of the falsity of some or all of the statements at issue. (Pls.' Opp'n at 13 (quoting *In re Read–Rite Corp. Sec. Litig.*, 335 F.3d 843, 848 (9th Cir.2003)). Acknowledging that a "reasonable inference" is insufficient under the PSLRA, Plaintiffs maintain that the reasonable inference drawn from Defendants' positions, compiled with the allegations that Weber was aware of the accounts receivables issues being experienced at Adecco North America and expressed the issue was a major concern for Swiss headquarters, raises a strong inference of scienter. *Id.* The Court disagrees.

The allegations regarding Weber are virtually unchanged from the Consolidated Complaint that this Court found deficient. Like the Consolidated Complaint, the Amended Complaint avers that former Adecco North America CFO Mark Eaton, who regularly communicated with Adecco's Treasurer Patrick Dobler, who reported directly to Weber, was aware of the problem with Olsten's receivables at the time of the acquisition and with Adecco's receivables following the 2000–2001 system conversion. (*Compare* CC ¶ 54 *with* AC ¶ 66.) That paragraph also alleges Defendant Weber "attended a meeting at the Company's Melville, New York, North America headquarters, where this problem was discussed as a significant concern for Swiss

headquarters." (*Compare* CC ¶ 54 *with* AC ¶ 66.)

The Court finds these allegations still fail to implicate Defendant Weber in the improper application of new cash to old accounts receivables. The Amended Complaint, like the Consolidated Complaint, is vague as to the "problem" discussed at the meeting. In the context of the paragraph, the "problem" could be Olsten's receivables at the time of acquisition and Adecco's receivables following the 2000–2001 system conversion. Alternatively, the "problem" could be in reference to the misapplication of cash receipts. The only difference in the two pleadings is that the Amended Complaint attributes this information to CW11. (AC ¶ 66.) Significantly, CW11 provides no insight on who attended the meeting or what was said. The absence of these details undermines a strong inference of scienter. Further, there are no allegations indicating how CW11 would know what Mr. Eaton was aware of, or how CW11 would know what was discussed at the undated meeting Weber attended. Thus, these allegations remain too vague and conclusory on which to impute scienter. *Cf. Daou,* 411 F.3d at 1015 (stating a complaint must describe sources "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged") (internal quotations omitted).

The Amended Complaint alleges Defendants were aware of Adecco North America's receivables problems and improper application of current cash receipts because these problems were "well known throughout the Company." (AC ¶ 66.) According to CW9, "[s]enior Adecco executives routinely discussed" the "pervasive problem" of outstanding and uncollected receivables. *Id.* ¶ 73. In dismissing the Consolidated Complaint, Court found these allegations to be too vague and conclusory

to give rise to a strong inference of scienter. *Adecco,* 371 F.Supp.2d at 1218. That one of the statements is attributed to CW9 does not persuade this Court to revisit its conclusion. CW9 is a former Regional Vice President for Adecco Staffing North America. (AC ¶ 52(i).) There are no allegations regarding that confidential witness's responsibilities, what interaction, if any, CW9 had with Defendants, or any other information indicating how CW9 would be in a position to know what senior Adecco executives discussed. Further, CW9 provides no details as to *what* was discussed, or more importantly, that those discussions reflected Defendants acted with the requisite state of mind.

Like the Consolidated Complaint, the Amended Complaint relies on internal reports to support Plaintiffs' theory Defendants were aware of or involved in the alleged accounting manipulations. This Court found the Consolidated Complaint's allegations regarding internal reports did not give rise to a strong inference of scienter because the pleading did not describe how or when any of the individual Defendants received the reports, how the individual Defendants knew the reports contained false information, or the sources of Plaintiffs' information regarding those reports. *Adecco,* 371 F.Supp.2d at 1218–19. The Amended Complaint contains additional allegations regarding these internal reports.

CW1 recalls that Adecco North America's financial information was transmitted via Excel spreadsheet to Switzerland. (AC ¶ 52(a).) CW10, a former international financial analyst for Adecco Staffing North America, adds that Defendant Weber maintained an office and spent time at Adecco's Redwood City, California Office, and that once a month financial information was sent to Redwood City for review. *Id.* ¶ 52(j). According to CW5, "corporate

disseminated monthly operating reports reflecting billing, collections, age trial balance ['ATB'], and NSB" that "continually revealed outstanding receivables." *Id.* ¶ 52(e).

Plaintiffs further allege Adecco North America's reports regarding aging receivables were inaccurate. According to CW6, a former Area Vice President for Adecco Staffing North America, Adecco's receivables procedures failed to record and track customers' payments, erroneously billed customers, and improperly charged interest to branch offices on outstanding receivables. *Id.* ¶ 52(f). CW6 states that Adecco's corporate offices in Melville, New York prepared a weekly ATB report that tracked the aging for the Company's outstanding receivables. *Id.* ¶¶ 52(f), 83. According to CW6, the ATB reports were consistently inaccurate. *Id.* ¶ 84. CW2, a former office manager and executive recruiter for Adecco similarly states that "flash reports" were consistently inaccurate and had to be submitted multiple times before updated information appeared in the reports. *Id.* ¶ 52(b). CW7, a former employee in the Accounts Receivable Department Adecco fabricated monthly reports regarding write-offs of bad receivables. *Id.* ¶ 87. CW7 also claims he refused to complete a false report regarding the amounts of bad receivables written off by Adecco North America in March 2003. *Id.* ¶ 52(g).

The allegations that financial information was provided to Defendants via internal reports do not suggest scienter, but rather routine business practice. Thus, that Swiss headquarters received an Excel spreadsheet, and that Weber received financial information at his Redwood office are insufficient to support a strong inference of scienter. There are no details as to the information provided in those reports or more particularly, facts indicating those reports contained information

indicating the reserves were too low or uncollectible receivables should have been written earlier before year-end 2002. *See Silicon Graphics,* 183 F.3d at 985 (holding that a complaint that relies on internal reports must "contain some specifics from those reports" and facts that indicate their reliability such as who drafted the reports, which officers reviewed them, and their contents).

The allegations that internal reports regarding aging receivables were inaccurate do not compel the conclusion Defendants engaged in fraud when reporting the Company's performance in 2000 and 2001. There are no averments quantifying the impact, if any of these purportedly inaccurate reports on the Company's allowance for receivables during the relevant time frame. Similarly, CW7's statement that he refused to falsify a report in March 2003 does not indicate why Adecco's 2000 and 2001 year-end financials understated reserves. Further, he does not provide any information regarding the impact of the allegedly fabricated monthly reports on Adecco's 2000 and 2001 financial statements.

The Amended Complaint relies on CW1 and CW8 for its scienter allegations. According to CW1, the reserve was reevaluated monthly at corporate headquarters. (AC ¶ 63.) Plaintiffs maintain that increasing the allowance for doubtful accounts by tens or hundreds of millions of dollars would have materially impacted the Company's earnings, and would have revealed that the merger was not what it had been represented to be. *Id.* According to CW1, other senior managers recognized that a higher reserve would reduce operating profits and bonuses and argued that the reserve should be lowered. *Id.* ¶¶ 63–64. CW8, a former Senior Regional Vice President of Adecco North America, was told by Southern Division Vice President

Joyce Russell that "Adecco maintained a reserve account to cover the outstanding receivables written off each quarter and that Adecco maintained a 'slush fund' to cover the losses." ¶¶ 52(h).

These allegations also fail to give rise to a strong inference of scienter. That reserves were reevaluated on a monthly basis does not mandate the conclusion the Defendants knew they should have raised their reserves to adequately cover the uncollectible receivables. Further, the fact that senior managers wanted to *lower* the reserve does not support the inference that reserves were too low during the time frame at issue or that Adecco should have written off the uncollectible receivables before year-end 2002. Finally, the allegation that Adecco "maintained a reserve account to cover the outstanding receivables written off each quarter and that Adecco maintained a 'slush fund' to cover the losses," *id.*, does not suggest that during the relevant time frame Adecco failed to adequately reserve for the uncollectible receivables or should have written off those receivables. To the contrary, that statement would suggest Adecco had reserved for uncollectible receivables.

Plaintiffs contend Swiss headquarters was aware of Adecco North America's receivables problem because Adecco North America suffered from liquidity problems. (Pls.' Opp'n at 10.) According to CW11, Adecco North America had cash shortages on a fairly regular basis, meaning that the money coming in was not enough to cover the payments going out. (AC ¶ 74.) Plaintiffs contend this was mainly due to the uncollected receivables problem. *Id.* When collections problems led to liquidity shortages, Adecco North America employed three different means of obtaining the cash needed to cover short-term expenses: short-term bank loans, short-term loans from the Company's Swiss headquarters, and liquidation of investments. *Id.*

¶ 75. According to Plaintiffs, the fact that Swiss headquarters loaned money to Adecco North America compels the conclusion Defendants were aware of the problems with the receivables.

These allegations do not support a strong inference of scienter. Absent from the Amended Complaint are detailed allegations indicating the Defendants made these loans to perpetuate a fraud. Further, the Court does not find as a matter of fact or law that a loan from a parent company to a subsidiary is indicative of accounting malfeasance. One company may need to borrow money from a related company because its business has taken an downturn due to changing market conditions. Simply, that Adecco loaned its North American operations money because the latter suffered from liquidity problems does not lead to the conclusion Defendants were actively engaged in fraud.

The Amended Complaint also relies on events occurring in 2003 to support scienter. According to CW1, E & Y raised the Company's internal control weaknesses relating to North American receivables as early as January 2003, and towards the end of 2003 E & Y informed Defendants it would not sign off on the Company's year-end financial statements due to the continuing misapplication of new moneys to old receivables. *Id.* ¶¶ 52(a), 54, 76. Plaintiffs further argue that the $100 million write-off in June 2003 and the $35 million write-off the following year are basically admissions that the earlier allowances for doubtful accounts were not large enough.

As discussed above, the Amended Complaint does not allege facts indicating Adecco should have increased its allowance for uncollectible receivables by $100 million in its year-end financial statements for 2000 and 2001. The subsequent write-offs of $100 million in year-end 2002 and addi-

tional $35 million in year-end 2003 therefore are not corroborative of anything. Plaintiffs' reliance on those write-offs constitutes impermissible "fraud by hindsight." *See Ronconi v. Larkin,* 253 F.3d 423, 430 n. 12 (9th Cir.2001) (stating that "[f]raud by hindsight is not actionable") (alteration in original) (internal quotations omitted); *Silicon Graphics,* 183 F.3d at 988 ("Congress enacted the PSLRA to put an end to the practice of pleading 'fraud by hindsight.' "). Similarly, that E & Y raised concerns about Adecco North America's internal controls in January 2003 does not, by itself, impugn the Defendants' actions in 2000 and 2001.

In sum, the Amended Complaint's allegations are too vague and conclusory to support a strong inference of scienter based on Defendants' positions or their purported knowledge of the accounting manipulations.

**B. Scienter Based on Stock Sales**

■ Unusual or suspicious stock sales can serve as circumstantial evidence of scienter. *Ronconi,* 253 F.3d at 434; *Silicon Graphics,* 183 F.3d at 986. "But not every sale of stock by a corporate insider shows that the share price is about to decline." *Ronconi,* 253 F.3d at 435. Accordingly, "courts have repeatedly held that the mere existence of stock sales does not raise a strong inference of fraudulent intent. [citation] Plaintiffs have the burden at the pleading stage of explaining why the stock sales were unusual or suspicious." *PetSmart,* 61 F.Supp.2d at 1000; *Ronconi,* 253 F.3d at 435; *Silicon Graphics,* 183 F.3d at 987. To meet this burden, the plaintiffs must show the trading was in amounts "dramatically out of line with prior trading practices, *at times calculated to maximize the personal benefit from undisclosed inside information.*" *Ronconi,* 253 F.3d at 435 (internal quotations omitted). The Ninth Circuit has identified three relevant factors when analyzing insider sales:

" '(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history.' " *Id.* (quoting *Silicon Graphics,* 183 F.3d at 986).

■ The Consolidated Complaint alleged that Defendant Jacobs is the chairman of the Jacobs Family Foundation, a private philanthropic organization with a 100% beneficial interest in KJ Jacobs AG. According to Plaintiffs, during December 2003, KJ Jacobs AG sold approximately 80,000 shares of Adecco common stock and transferred by way of gift over 6 million shares of Adecco common stock. The Court held these allegations were insufficient because the Consolidated Complaint did not allege facts indicating the stock transactions at issue were out of line with prior trading history. *Adecco,* 371 F.Supp.2d at 1221–22. Further, the stock transactions occurred in December 2003, *after* the Company wrote off uncollectible receivables in its year-end 2002 financial statements, and at a time that is not temporally proximate to the alleged accounting fraud occurring in 2000 and 2001. *Id.* at 1222.

The Amended Complaint again relies on the December 2003 stock sale by KJ Jacobs AG to support an inference of scienter. (AC ¶¶ 7, 50, 53.) The pleading has added the allegation that Jacobs caused KJ Jacobs AG to sell $196 million worth of Adecco stock on February 9, 2001. *Id.* ¶¶ 2, 50, 53. Plaintiffs contend this sale occurred at approximately the same time Defendant Weber attended a meeting at North American headquarters where the company's North American receivables were discussed as a major concern for Swiss Headquarters. *Id.* ¶ 50. The Amended Complaint also alleges that during that time the Company "started concealing its uncollectible receivables by

applying newly received moneys to old receivables." *Id.*

The additional stock sale, although within the relevant time period, is still insufficient to raise a strong inference of scienter. Even assuming Jacobs controlled the disposition of the stock—a matter disputed by the parties—there are no allegations he obtained any personal benefit from the transactions pleaded. Further, as with the Consolidated Complaint, there is no information provided indicating the transactions were out of line with prior trading history. Also significant is the absence of any allegations that the other Defendants engaged in insider sales during the Class Period. "One insider's well timed sales do not support the 'strong inference' required by the statute where the rest of the equally knowledgeable insiders act in a way inconsistent with the inference that the favorable characterizations of the company's affairs were known to be false when made." *Ronconi,* 253 F.3d at 436 (internal footnote omitted); *see also Acito,* 47 F.3d at 54 (holding that one individual defendant's stock sales did not give rise to a strong inference of scienter when he sold only 11% of holdings and other officers did not sell stock). Accordingly, the Court concludes the Amended Complaint's averments regarding stock sales do not raise a strong inference of scienter. *Cf. Lipton,* 284 F.3d at 1036–37 (finding that one insider's stock sales did not provide an inference of fraudulent intent was reinforced by the fact he was the only insider to sell stock during the class period); *Ronconi,* 253 F.3d at 436 (holding that one defendant's trading supported only a weak inference of scienter because the other equally-knowledgeable insiders sold too soon to take advantage of their allegedly fraudulent statements).

## C. Scienter Allegations In Totality

When reviewing whether a complaint properly states a securities fraud claim under the PSLRA, the court must consider " 'whether the total of plaintiffs' allegations, even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness.' " *Daou,* 411 F.3d at 1022 (quoting *Nursing Home,* 380 F.3d at 1230); *Am. West,* 320 F.3d at 938. When "considering whether a strong inference of scienter has been pled, 'the court must consider *all* reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs.' " *Daou,* 411 F.3d at 1022 (quoting *Gompper,* 298 F.3d at 897).

The crux of Plaintiffs' theory is that Defendants overstated revenues by failing to write off or properly reserve for uncollectible receivables. However, the Amended Complaint advances seemingly dissonant theories for how this fraud was perpetuated. On the one hand, certain paragraphs suggest the Defendants directed the application of new moneys to old accounts receivable. Other averments indicate the misapplication of current cash receipts to old receivables occurred because of material weaknesses in internal controls. This suggests mismanagement, not fraud. The deficiencies in the Amended Complaint's allegations regarding falsity undermine any inference of scienter.

Further, even if the Amended Complaint's allegations regarding the Defendants' positions in Adecco were sufficient to raise a reasonable inference of scienter, the Court finds the remaining scienter allegations are insufficient to bolster this inference into a strong inference. The remaining allegations are either too vague and conclusory, basing the Defendants' knowledge on Plaintiffs' theory that the problems were "well known" and "discussed," or reflected in various internal reports whose contents, authors, recipients, and dates, are not described in any

detail. *See Daou,* 411 F.3d at 1022 ("General allegations of defendants' 'hands-on' management style, their interaction with other officers and employees, their attendance at meetings, and their receipt of unspecified weekly or monthly reports are insufficient to support a strong inference of scienter."). In addition, that KJ Jacobs AG is the only purported insider who traded stock during the relevant time period negates any inference of scienter. Also undermining a strong inference of scienter is the lack of information indicating any of the confidential witnesses would have been in a position to know what Defendants knew during the relevant time period. Accordingly, taken as a whole, the Amended Complaint fails to plead sufficient facts indicating Defendants knowingly or recklessly made false or misleading statements when reporting the Company's 2000 and 2001 financial results in SEC filings and press releases, and must be dismissed.

### SUFFICIENCY OF THE ALLEGATIONS OF A § 20(a) VIOLATION.

Section 20(a) of the 1934 Securities and Exchange Act provides for controlling person liability for every person who, directly or indirectly, controls any person liable under any of the provisions of this title. 15 U.S.C. § 78t(a). To establish control person liability, a plaintiff must show that a primary violation occurred, and that the defendant exercised actual power or control over the primary violator. *Am. W.,* 320 F.3d at 945. Accordingly, because Plaintiffs' § 10(b) claim fails, the § 20(a) claim must be dismissed as well. *Heliotrope General, Inc. v. Ford Motor, Co.,* 189 F.3d 971, 978 (9th Cir.1999).

### LEAVE TO AMEND

Leave to amend a complaint should be freely granted unless amendment would be futile. *Eminence Capital, LLC v. Aspeon, Inc.,* 316 F.3d 1048, 1052 (9th Cir.2003); *Lipton,* 284 F.3d at 1039. This Court's previous order detailed the various deficiencies in the Consolidated Complaint. The Amended Complaint's allegations are not significantly different, adding only averments regarding confidential witnesses who do not appear to have been in a position to knew the information they purport to report. The Court finds further leave to amend is not warranted under these circumstances. Accordingly, the Amended Complaint will be dismissed with prejudice.

### CONCLUSION

Having considered the parties' briefs, the record, oral argument, applicable law, and good cause appearing, **IT IS HEREBY ORDERED:**

1. Defendants' motion to dismiss is **GRANTED**.

2. Because the Plaintiffs have had an opportunity to amend the complaint to meet the pleading requirements under the PSLRA and *Silicon Graphics,* the Amended Complaint is **DISMISSED WITH PREJUDICE**.

3. Defendants' request for judicial notice is **GRANTED** insofar as the Court has relied on those documents.

4. The Clerk of the Court is directed to enter judgment in this action, and the judgment shall apply to all matters that have been consolidated to the instant master file, *In re Adecco Securities Litigation,* 04cv0129–L(WMc).

**IT IS SO ORDERED.**